## PORT RICHMOND AND BERGEN POINT FERRY COMPANY v. BOARD OF CHOSEN FREEHOLDERS OF HUDSON COUNTY.

### ERROR TO THE COURT OF ERRORS AND APPEALS OF THE STATE OF NEW JERSEY.

No. 225.   Argued March 4, 1914.—Decided June 8, 1914.

At common law the right to maintain a public ferry lies in franchise.

In England such a ferry could not be set up without the King's license, and, in this country, the right has been made the subject of legislative grant.

Transportation of persons and property from one State to another by ferry is interstate commerce and subject to regulation by Congress, and it is beyond the competency of the States to impose direct burdens thereon; Congress not having acted on the subject, however, the States may exercise a measure of regulatory power not inconsistent with the Federal authority and not actually burdening, or interfering with, interstate commerce.

A State has the power to establish boundary ferries, not a part of a continuous interstate carrier system, and regulate the rates to be charged from its shores, subject to the paramount authority of Congress over interstate commerce; and, even though there might be a difference in the rate of ferriage from one side of the stream as compared with the rate charged from the other side.

Questions in respect to ferries such as the one involved in this case, generally imply transportation for a short distance, generally between two specified points, unrelated to other transportation, thus presenting situations essentially local and requiring regulation according to local conditions.

The absence of Federal action in such a case does not presuppose that the public interest is unprotected from extortion.

A State being able to exercise the power to regulate ferries, it follows that it may not derogate from the similar authority of another State; its regulating power therefrom extends only to transactions within its own territory and to ferriage from its own shores.

Rates of ferriage fixed by one State from its own shore on a boundary ferry do not preclude the other State from fixing other rates if reasonable with respect to the ferry maintained on its side.

Where the state court has not construed an ordinance fixing rates

of ferriage on a boundary ferry as requiring the issuing of round trip tickets, and this court does not so construe it, the ordinance may be valid as limiting the amount which may be charged if such trip tickets are issued; and so *held* in this case. *Quære* as to whether a State may require round trip tickets to be issued on a boundary ferry.

82 N. J. Law, 536, affirmed.

THE facts, which involve the power of a State, or a municipality acting under its authority, to establish rates of transportation on ferries plying between one of its ports and a port of another State, are stated in the opinion.

*Mr. Frank Bergen* for plaintiff in error:

A State cannot prescribe rates to be charged by a person or corporation operating an interstate ferry not in connection with a railroad, because a ferry across an interstate stream is an instrument of interstate commerce; the transportation of passengers, vehicles, horses and cattle from one State to another, is interstate commerce; prescribing rates for such transportation is a direct regulation of interstate commerce; and the power to regulate directly commerce among the States can be exercised only by authority of Congress. *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 204; *Covington Elevated R. R. Co.* v. *Kentucky,* 154 U. S. 224.

A ferry operated in connection with a railroad and carrying passengers who arrive at the ferry by rail, and also passengers who arrive at the ferry otherwise, is not subject to regulation as to its rates by authority of a State. *N. Y. Central Case,* 74 N. J. Law, 367; 76 N. J. Law, 664; 80 N. J. Law, 305; and see *International Transit Co.* v. *Sault Ste. Marie,* 194 Fed. Rep. 522; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 620; *Gloucester Ferry Case,* 114 U. S. 196.

States have indeed exercised control in some instances over commerce by means of interstate ferries and bridges

since the Federal Constitution was adopted, and there are expressions in a few opinions of this court that have been supposed to recognize the authority of the States to do so (see *Fanning* v. *Gregoire*, 16 How. 524; *Conway* v. *Taylor*, 1 Bl. 603; *Wiggins Ferry Co.* v. *East St. Louis*, 107 U. S. 365), but there is no decision of this court to that effect. *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, does not support this, although sometimes cited to that effect, and see *St. Clair County* v. *Interstate Transfer Co.*, 192 U. S. 454; *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 204; *N. Y. Cent. R. R. Co.* v. *Hudson County*, 227 U. S. 248; *Wabash Ry. Co.* v. *Illinois*, 118 U. S. 557.

Nearly every important instrument of interstate commerce was created by authority of the States; but that fact does not justify or support the conclusion that commerce carried on by those instruments may be directly regulated by the States. *Covington Bridge Co.* v. *Kentucky*, *supra*, at p. 219; *New York* v. *New Jersey Nav. Co.*, 106 N. Y. 28.

The States may make and enforce regulations that indirectly and in minor particulars affect interstate commerce until Congress takes action, after that, as to all matters covered by congressional action, state regulations must give way. *Gloucester Ferry Case*, *supra*, at p. 214; *Covington Bridge Co.* v. *Kentucky*, *supra*; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489; *Minnesota Rate Cases*, 230 U. S. 352, 398–412.

For cases in New Jersey in which the authority of the State to prescribe rates to be charged by owners of interstate ferries has been considered, see *State* v. *Freeholders of Hudson*, 23 N. J. Law, 206, aff'd, 24 N. J. Law, 718; *New York Central Case*, 74 N. J. Law, 367; 76 N. J. Law, 664, 679; 227 U. S. 248.

The history of the commerce clause of the Constitution confirms the opinion that it was intended to transfer the power to regulate directly foreign commerce and commerce

among the States of all kinds and by every means, from the States to the National Government. See letters by Madison to Cabell (1829), and to Davis (1832); Letters and Writings of Madison, vol. iv, pp. 14 and 247; Curtis' Const. Hist. U. S., vol. 1, p. 231, note; Elliot's Debates, vol. 1, p. 115, ed. 1876; Webster's Works, vol. vi, p. 9, 8th ed. 1854; 9 Wheat. at p. 226, and 12 Wheat. at p. 445.

If the power to regulate foreign commerce was transferred to Congress by the Constitution, it cannot be denied that power to regulate interstate commerce was also transferred at the same time. Story's Constitution, § 1065; *Crutcher* v. *Kentucky*, 141 U. S. 47, 57; *West. Un. Tel. Co.* v. *Kansas*, 216 U. S. 1. Rev. Stat., § 2792, evidently relates to ferries between points in Canada and Mexico and the United States, but § 4426 applies to all ferryboats, and see § 4400; *Hall* v. *De Cuir*, 95 U. S. 485, 488.

*Mr. James J. Murphy* for defendant in error.

MR. JUSTICE HUGHES delivered the opinion of the court.

The plaintiff in error, Port Richmond and Bergen Point Ferry Company, was incorporated in 1848 (c. 306) by special act of the legislature of New York for the purpose of maintaining a ferry across the Kill von Kull from Port Richmond, Staten Island, New York, to Bergen Point, Hudson County, New Jersey.[1] This act prescribed rates of ferriage as did also the amendatory acts of 1857 (c. 692) and 1868 (c. 778).

The ferry is not operated in connection with any railroad.

In July, 1905, the Board of Chosen Freeholders of the County of Hudson, New Jersey, passed two resolutions

---

[1] See also Laws of New York, 1857, chap. 692; 1860, chap. 266; 1864, chap. 290; 1868, chap. 778; 1873, chap. 300; 1881, chap. 652.

fixing the rates to be taken at the ferry of this company within the County of Hudson for the transportation of foot passengers for single trips to the New York terminal, and for round trips to that terminal and return, respectively. This action was taken under the authority of an act of the legislature of New Jersey passed in 1799, providing as follows: "That the board of chosen freeholders shall be, and they hereby are empowered and directed to fix the rates to be taken at the several ferries within their respective counties, and the same, from time to time, to revise, alter, amend, or make anew at their discretion." Comp. Stat. (N. J.) p. 2308. On certiorari, the Supreme Court of the State of New Jersey sustained the validity of these resolutions against the objection that they were repugnant to the commerce clause of the Federal Constitution (80 N. J. Law, 614) and its judgment was affirmed by the Court of Errors and Appeals. 82 N. J. Law, 536. This writ of error is prosecuted.

The plaintiff in error contends that the action of the board is void for the reason that the transportation is interstate and the fixing of rates therefor is a direct regulation of interstate commerce.

At common law, the right to maintain a public ferry lies in franchise; in England such a ferry could not be set up without the King's license, and, in this country, the right has been made the subject of legislative grant. *Blissett* v. *Hart,* Willes, 508; *Fay, Petitioner,* 15 Pick. 243, 249, 253; *Mayor &c. of New York* v. *Starin,* 106 N. Y. 1, 10, 11; 3 Kent's Com. 458; 2 Washburn, Real Prop., 4th ed., 292. The States have been accustomed to grant such franchises not only for ferries wholly intrastate but also for those to be operated from their shores to other States. Cooley, Const. Lim. 740. They have fixed the rates for such ferriage; and this has been done both directly by the legislature and also through designated courts and local boards acting under legislative sanction. The prac-

tice has had continuous illustration in a great variety
of instances from the foundation of the Government to
the present day.[1]

The Court of Errors and Appeals of New Jersey in the
case of *Chosen Freeholders of Hudson County* v. *The State*
(1853), 4 Zab. 718, sustained the authority of the board
to prescribe ferry rates between New Jersey and New
York. Speaking through Elmer, J., the court thus de-
scribed conditions existing at the time of the passage of
the above-mentioned act of 1799 and its purpose: "When
the act was passed, long before the invention of steam-
boats, ferries were generally the property of one or two
individuals, established for the public convenience and
private gain, by the owners of the shore, sometimes by
virtue of a grant or law, and sometimes without any public
authority. The owner or keeper resided on the one bank
or the other of the river over which the ferry passed, and
kept his boats and other apparatus where he resided. The
ferry was commonly known and designated by the name
of the place from which it started, and where such owner
resided, as Paulus Hook ferry; or from the name of the

---

[1] A few of these instances may be cited:

*New York.*—Across Lake Champlain: Laws of 1803, chap. 37; 1810,
chap. 61; 1812, chap. 60. (These are referred to in the argument of
counsel in *Gibbons* v. *Ogden*, 9 Wheat. 1, 97; see 3 C. R. & G. Webster
ed. Laws of New York, p. 321; 6 Websters & Skinner ed., p. 16; *id.*,
p. 394.) See also Laws of 1831, chap. 105; 1847, chap. 288; 1886,
chap. 674; 1901, chap. 442; 1907, chap. 392. Between New York and
New Jersey: Laws of 1850, chap. 314; 1870, chap. 731.

*Vermont.*—Across Lake Champlain: Laws of 1799, p. 63; 1801, p. 72;
1820, chap. 115; 1890, chap. 116; 1896, chap. 298.

*New Hampshire.*—Across Connecticut River: Laws of 1863, chap.
2822; 1867, chap. 86.

*Missouri.*—Mississippi River: Laws of 1855, p. 516; 1870, p. 231.
Des Moines River: Laws of 1855, p. 517. Missouri River: Laws of
1855, p. 229; 1863–64, p. 312.

*Nebraska.*—Compiled Statutes of 1907, § 3549.

owner or keeper, as Dunk's ferry, Corriel's ferry, etc. In many cases, where the river was not too wide, a bell or horn, or some other signal was established on the side of the river opposite to that where the owner lived, so that persons coming there who desired to pass over, could make known their wishes. Probably but few, if any of the keepers, had a boat constantly running, or started at any particular hour. In some cases, there were ferry owners on both sides of the river; but the ferry or ferries on each side were considered and spoken of as distinct ferries, and had distinct owners or keepers. This was the case with most, if not all, the ferries between Philadelphia and what is now called Camden; and the ferries on each side were regulated and governed by the laws of the State in which such owner or keeper resided. Sail and row-boats, and flats or scows, were the vessels in use, as is manifest from the act itself. . . .—The act meant to authorize, and did authorize the boards of freeholders in the several counties, to regulate the fares to be taken at the ferry situate within that county; that is, at the ferry establishment of the owner or keeper. . . . Even if it might happen, upon this construction, that one board might establish one set of rates at one side, and another board another set on the other side, or that each State might have different regulations, where the ferry was over one of the rivers forming the boundary between this and another State, I do not see that there would be any important conflict of authority. Each power regulated what was done within its own jurisdiction, and left to others to regulate what was done in theirs. Existing ferries between this State and New York, and this State and Pennsylvania are now, in numerous instances, regulated by the laws of this State, without the occurrence of any difficulty. . . .—Without deeming it necessary to go over and specially refer to the different acts . . . it is sufficient to say, that they show a course of legisla-

tion, commencing in 1714, and continued till near the passage of the act of 1799, by which the ferries over the waters dividing this State from the adjoining States, were regulated by the laws of New Jersey, in those cases where ferry establishments were within this State. . . . To effect this object" (i. e. of the act) "the word ferries must be interpreted to mean, what in those laws it had obviously included, ferries the owners or keepers of which resided in this State, or which had one of their termini where fares were demanded, in this State, and not merely ferries in the technical meaning, of an entire passage across a river or other water. . . . If set up without public authority, it" (the ferry) "was liable at any time to be stopped, or in the discretion of the legislature to be regulated. . . . It is sufficient to authorize these rates, that it is a public ferry, and that there is no law prescribing rates for it, inconsistent with the exercise of the power by the board of chosen freeholders." *Supra*, pp. 721–724, 726. This decision was followed by the state court in the present case.[1]

In view of the extended consideration which the decisions of this court bearing upon the questions involved have received in recent opinions (*St. Clair County* v. *Interstate Transfer Co.*, 192 U. S. 454; *N. Y. C. & H. R. R. R. Co.* v. *Board of Chosen Freeholders*, 227 U. S. 248), it is not necessary to review them at length. The authority of the State to grant franchises for ferries to be operated from its shores across boundary waters was distinctly recognized in *Fanning* v. *Gregoire*, 16 How. 524; *Conway* v. *Taylor's Executor*, 1 Black, 603; and *Wiggins Ferry Co.*

---

[1] As to the views of other state courts upon this subject, see *People* v. *Babcock*, 11 Wend. 586; *Newport* v. *Taylor*, 16 B. Mon. 699; *Marshall* v. *Grimes*, 41 Mississippi, 27; *Carroll* v. *Campbell*, 108 Missouri, 550; *Memphis* v. *Overton*, 3 Yerg. 387, 390; *Burlington Ferry Co.* v. *Davis*, 48 Iowa, 133; *Tugwell* v. *Eagle Pass Ferry Co.*, 74 Texas, 480; *State* v. *Faudre*, 54 W. Va. 122; *Chilvers* v. *People*, 11 Michigan, 43.

v. *East St. Louis*, 107 U. S. 365. While in *Fanning* v. *Gregoire*, *supra*, the plaintiff's license for a ferry across the Mississippi river from Dubuque, Iowa, was held under the terms of the grant not to be exclusive as against the subsequent licensee, the court said that the commercial power of Congress did not 'interfere with the police power of the States in granting ferry licenses.' In *Conway* v. *Taylor's Executor*, *supra*, the court upheld a judgment which restrained the appellants (the owners of a ferry from Cincinnati, Ohio, to Newport, Kentucky) from conducting the ferry from the Kentucky shore to Ohio in violation of the rights of the appellees under their Kentucky franchise. Referring to the latter, the court said (p. 631): "The franchise is confined to the transit from the shore of the State. The same rights which she claims for herself she concedes to others. . . . It was shown in the argument at bar that similar laws exist in most, if not all, the States bordering upon those streams. They exist in other States of the Union bounded by navigable waters." With respect to 'ordinary commercial navigation' the authority of the appellants to transport persons and property from the Kentucky shore was undoubted. The owners of the Kentucky franchise, it was said, had no right to exclude or restrain those who were prosecuting 'the business of commerce in good faith, without the regularity or purposes of ferry trips'; but, as the appellants' boat was run 'openly and avowedly as a ferry-boat,' as 'that was her business,' the injunction was sustained. After referring to the commerce clause, the opinion concluded, (p. 634): "Undoubtedly, the States, in conferring ferry rights, may pass laws so infringing the commercial power of the nation that it would be the duty of this court to annul or control them. . . .—There has been now nearly three-quarters of a century of practical interpretation of the Constitution. During all that time, as before, the Constitution had its birth, the States have exercised

the power to establish and regulate ferries; Congress never. We have sought in vain for any act of Congress which involves the exercise of this power.—That the authority lies within the scope of that 'immense mass' of undelegated powers which 'are reserved to the States respectively,' we think too clear to admit of doubt." These cases were cited with approval in *Wiggins Ferry Co.* v. *East St. Louis, supra.* There, the ferry company was an Illinois corporation and held a franchise granted by the legislature of that State for the operation of a ferry from East St. Louis, Illinois, to St. Louis, Missouri. The payment of a license tax imposed upon the company in Illinois, for the privilege of conducting the ferry, was resisted under the commerce clause, but the contention was overruled, the court holding that "the levying of a tax upon vessels or other water-craft or the exaction of a license fee by the State within which the property subject to the exaction has its *situs,* is not a regulation of commerce within the meaning of the Constitution." (*Id.* p. 373.)

It is manifest, however, that the transportation of persons and property from one State to another is none the less interstate commerce because conducted by ferry; and it is not open to question that ferries maintained for that purpose are subject to the regulating power of Congress. It necessarily follows that whatever may properly be regarded as a direct burden upon interstate commerce, as conducted by ferries operating between States, it is beyond the competency of the States to impose. This was definitely decided in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196. The Commonwealth of Pennsylvania had imposed a tax upon the ferry company, based upon the estimated value of its capital stock, upon the ground that it was doing business within the State. The company was incorporated in New Jersey and maintained a ferry from Gloucester in that State to Philadelphia. Save for the wharf that it leased at the latter place, its

property, including its boats, had its *situs* in New Jersey; and its entire business consisted in ferrying. The tax upon the 'receiving and landing of passengers and freight at the wharf in Philadelphia,' which was a necessary incident to the transportation across the Delaware river, was a tax upon that transportation; and in this view the tax was held to be void as one laid upon interstate commerce. "The only interference of the State with the landing and receiving of passengers and freight, which is permissible," said the court, "is confined to such measures as will prevent confusion among the vessels, and collision between them, insure their safety and convenience, and facilitate the discharge or receipt of their passengers and freight, which fall under the general head of port regulations." (*Id.* p. 206.) It was said that the statement of Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, had relation to ferries entirely within the State. "Ferries," continued the court, (p. 216), "between one of the States and a foreign country cannot be deemed, . . . beyond the control of Congress under the commercial power . . . neither are ferries over waters separating States." And it was pointed out that Congress had passed various laws respecting international and interstate ferries, the validity of which was not open to question [Rev. Stat., §§ 2792, 4233 (Rule 7), 4370, 4426].

But, in view of the nature of the subject and the diversified regulation which was necessary, it was recognized that the States were entitled to exercise a measure of regulatory power not inconsistent with the Federal authority. The court said: "It is true that, from the earliest period in the history of the government, the States have authorized and regulated ferries, not only over waters entirely within their limits, but over waters separating them; and it may be conceded that in many respects the States can more advantageously manage

such inter-State ferries than the General Government; and that the privilege of keeping a ferry, with a right to take toll for passengers and freight, is a franchise grantable by the State, to be exercised within such limits and under such regulations as may be required for the safety, comfort and convenience of the public. Still the fact remains that such a ferry is a means, and a necessary means, of commercial intercourse between the States bordering on their dividing waters, and it must, therefore, be conducted without the imposition by the States of taxes or other burdens upon the commerce between them. Freedom from such impositions does not, of course, imply exemption from reasonable charges, as compensation for the carriage of persons, in the way of tolls or fares, or from the ordinary taxation to which other property is subjected, any more than like freedom of transportation on land implies such exemption." (*Id.* p. 217.)

In *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 204, the question related to the power of the State of Kentucky to regulate tolls upon an interstate bridge built pursuant to the concurrent action of Kentucky and Ohio. The power was denied under the commerce clause. Reviewing the authorities, the opinion was expressed that the principle involved was identical with that applied in *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, with respect to interstate railroad rates, and that (at least in the absence of mutual action) it was impossible for either State to fix a tariff of charges. It was said that it did not follow that because a State might 'authorize a ferry or bridge from its own territory to that of another State' it might 'regulate the charges upon such bridge or ferry.' It was pointed out, however, that the State of Kentucky, by the statute in question attempted 'to reach out and secure for itself a right to prescribe a rate of toll applicable not only to persons crossing from Kentucky to Ohio, but from Ohio to Kentucky,' a right which practically nullified

'the corresponding right of Ohio to fix tolls from her own State.' (*Id.* p. 220.) And this was an adequate basis for the judgment. Four of the justices of the court, concurring in the judgment, announced their view that 'the several States have the power to establish and regulate ferries and bridges, and the rates of toll thereon, whether within one State, or between two adjoining States, subject to the paramount authority of Congress over interstate commerce.' (*Id.* p. 223.)

In *Louisville &c. Ferry Co.* v. *Kentucky*, 188 U. S. 385, where a Kentucky corporation conducting a ferry across the Ohio river between Kentucky and Indiana, held ferry franchises from both States, it was decided that the franchise from Indiana could not be taxed by Kentucky. The court said that the franchises were distinct; that each was 'property entitled to the protection of the law'; and that the Indiana franchise must be regarded as an incorporeal hereditament having its situs in that State and hence as beyond the jurisdiction of Kentucky. The case of *St. Clair County* v. *Interstate Transfer Co.*, 192 U. S. 454, involved the right of a county in Illinois to recover statutory penalties for carrying on, without a ferry license, the transportation of cars across the Mississippi river between points in Illinois and Missouri. Conceding, *arguendo*, that the police power of a State extends 'to the establishment, regulation and licensing of ferries on a navigable stream, being the boundary between two States,' it was held that the business of transporting railroad cars was not a ferry business in the proper sense; and that the requirements of the ordinance in question made it a direct burden upon interstate commerce. The ordinance was therefore held to be invalid. In *New York Central R. R. Co.* v. *Board of Chosen Freeholders*, 227 U. S. 248, the question concerned the authority of the New Jersey board to fix rates for a ferry between Weehawken, New Jersey, and New York City.

It appeared that the ferry was operated in connection with a railroad and it was concluded that the action of Congress with respect thereto (Act to Regulate Commerce, February 4, 1887, § 1, c. 104, 24 Stat. 379) had the effect of freeing the subject from state control.

Coming then to the question now presented—whether a State may fix reasonable rates for ferriage from its shore to the shore of another State,—regard must be had to the basic principle involved. That principle is, as repeatedly declared, that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive; that, in other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act; and that, when Congress does act, the exercise of its authority overrides all conflicting state legislation. *Cooley* v. *Board of Wardens*, 12 How. 299, 319; *Ex parte McNeil*, 13 Wall. 236, 240; *Welton* v. *Missouri*, 91 U. S. 275, 280; *County of Mobile* v. *Kimball*, 102 U. S. 691, 697; *Gloucester Ferry Co.* v. *Pennsylvania, supra*, p. 204; *Bowman* v. *Chicago &c. Railway Co.*, 125 U. S. 465, 481, 485; *Gulf, Colorado & Sante Fe Ry. Co.* v. *Hefley*, 158 U. S. 98, 103, 104; *Northern Pacific Ry. Co.* v. *Washington*, 222 U. S. 370, 378; *Southern Ry. Co.* v. *Reid*, 222 U. S. 424, 436; *Minnesota Rate Cases*, 230 U. S. 352, 399, 400. It is this principle that is applied in holding that a State may not impose direct burdens upon interstate commerce, for this is to say that the States may not directly regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed by valid Federal rule. (*Gloucester Ferry Co.* v. *Pennsylvania, supra*.) It was this principle which governed the decision in *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, as to interstate railroad rates. Considering the conditions of interstate railroad trans-

portation, which might extend not only from one State to another but through a series of States, or across the Continent, and the consequences which would ensue if each State should undertake to fix rates for such portions of continuous interstate hauls as might be within its territory, the conclusion was reached that 'this species of regulation' was one 'which must be, if established at all, of a general and national character' and could not be 'safely and wisely remitted to local rules.' (*Id.* p. 577.)

But, in the case of ferries, we have a subject of a different character. We dismiss from consideration those ferries which are operated in connection with railroads, and cases, if any, where the ferriage is part of a longer and continuous transportation. Ferries, such as are involved in the present case are simply means of transit from shore to shore. These have always been regarded as instruments of local convenience which, for the proper protection of the public, are subject to local regulation; and where the ferry is conducted over a boundary stream, each jurisdiction with respect to the ferriage from its shore has exercised this protective power. There are a multitude of such ferries throughout the country and, apart from certain rules as to navigation, they have not engaged the attention of Congress. We also put on one side the question of prohibitory or discriminatory requirements, or burdensome exactions imposed by the State, which may be said to interfere with the guaranteed freedom of interstate intercourse or with constitutional rights of property. The present question is simply one of reasonable charges. It is argued that the mere fact that interstate transportation is involved is sufficient to defeat the local regulation of rates because, it is said, that it amounts to a regulation of interstate commerce. But this would not be deemed a sufficient ground for invalidating the local action without considering the nature of the regulation and the special subject to which it relates. Quarantine and pilotage

regulations may be said to be quite as direct in their opera-
tion, but they are not obnoxious when not in conflict with
Federal rules. The fundamental test, to which we have
referred, must be applied; and the question is whether,
with regard to rates, there is any inherent necessity for
a single regulatory power over these numerous ferries
across boundary streams; whether, in view of the character
of the subject and the variety of regulation required, it is
one which demands the exclusion of local authority.
Upon this question, we can entertain no doubt. It is true
that in the case of a given ferry between two States there
might be a difference in the charge for ferriage from one
side as compared with that for ferriage from the other.
But this does not alter the aspect of the subject. The
question is still one with respect to a *ferry* which nec-
essarily implies transportation for a short distance, almost
invariably between two points only, and unrelated to other
transportation. It thus presents a situation essentially
local requiring regulation according to local conditions.
It has never been supposed that because of the absence
of Federal action the public interest was unprotected from
extortion and that in order to secure reasonable charges
in a myriad of such different local instances, exhibiting
an endless variety of circumstance, it would be necessary
for Congress to act directly or to establish for that purpose
a Federal agency. The matter is illuminated by the con-
sideration of this alternative for the point of the contention
is that, there being no Federal regulation, the ferry rates
are to be deemed free from all control. The practical
advantages of having the matter dealt with by the States
are obvious and are illustrated by the practice of one hun-
dred and twenty-five years. And in view of the character
of the subject, we find no sound objection to its continu-
ance. If Congress at any time undertakes to regulate
such rates, its action will of course control.

If the State may exercise this power, it necessarily

follows that it may not, in its exercise, derogate from the similar authority of another State. The state power can extend only to the transactions within its own territory and the ferriage from its own shore. It follows that the fact that rates were fixed by New York did not preclude New Jersey from establishing reasonable rates with respect to the ferry establishment maintained on its side.

With respect to the rates for round trips, we do not construe the ordinance as requiring the company to issue round-trip tickets at its office in New Jersey. We may not look into the testimony and it does not appear that such a construction has been placed upon the ordinance by the state court. Viewed as a limitation upon rates charged for such round-trip tickets, when sold by the company in New Jersey, we think that the ordinance is valid being one relating to the transactions of the company in New Jersey and the charges there enforced. Whether it would be competent for the State, through the local board, to require the company to issue round-trip tickets, is a question not presented by the record, and we express no opinion upon it.

The judgment is affirmed.

*Affirmed.*