## Tri-State Ferry Company v. Birney.

(Decided October 17, 1930.)

WHEELER & HUGHES for appellant.

HENRY F. TURNER, SHELBOURNE & WHITE and M. C. ANDERSON for appellee.

TRABUE, DOOLAN, HELM & HELM, amici curiæ.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

In April, 1924, the county court of Ballard county, in accordance with the provisions of the Statutes governing the establishment and regulations of ferries, Carroll's Kentucky Statutes, 1930 Edition, secs. 1800 to 1821, inclusive, granted to the appellee, R. I. Birney, a franchise to operate a ferry across the Ohio river between East Cairo, Ky., and Cairo, Ill. In the summer of 1928, the appellant, Tri-State Ferry Company, which was operating a ferry between Cairo, Ill., and Wickliffe, Ky., a town situated on the east bank of the Mississippi river about six miles below Cairo, began the ferriage of passengers and vehicles between East Cairo and Cairo. Birney thereupon brought this suit to enjoin the ferry company from landing its boats at East Cairo within a mile and a half of the landing of his ferry for the purpose of embarking passengers and vehicles for ferriage across the river and from ferrying passengers and vehicles from any landing within that mile and a half

to the opposite shore. The circuit court, on final hearing, granted Birney the relief he sought, and the ferry company has appealed.

The defense of the ferry company to this suit of Birney is based upon two contentions.

First, Birney's ferry franchise is void because it was not sold in accordance with the provisions of section 164 of our State Constitution.

Secondly, the state of Kentucky has no power to legislate with reference to the right of ferriage across the Ohio river, because such legislation is an interference with and a burden upon interstate commerce and hence violative of the Federal Constitution (article 1, sec. 8, cl, 3.)

Section 164 of our State Constitution reads:

"No county, city, town, taxing district or other municipality shall be authorized or permitted to grant any franchise or privilege, or make any contract in reference thereto, for a term exceeding twenty years. Before granting such franchise or privilege for a term of years such municipality shall first, after due advertisement, receive bids therefor publicly, and award the same to the highest and best bidder; but it shall have the right to reject any or all bids. This section shall not apply to a trunk railway."

The limitations created by this section are by the provisions of the section itself applicable only to action by municipalities or other local subdivisions as to matters under their control. The section does not refer to the Legislature nor to matters which the Legislature may withhold from municipal or local control. The inherent right to grant a franchise inheres in the sovereignty within which it is proposed to exercise that franchise, but, as said in the case of Irvine Toll Bridge Co. v. Estill County, 210 Ky. 170, 275 S. W. 634, 636:

"It is competent for such sovereignty to delegate the right to grant the franchise to some or all of its municipalities as political subdivisions of the government, or perhaps it may vest such power in such agencies of government as it sees proper."

When the Legislature does delegate the right to grant a franchise to some political subdivision of the

government, then the provisions of section 164 of the Constitution come into play. But when the Legislature retains to itself the granting of the franchise, the provisions of section 164 of the Constitution have no application. The granting of a ferry franchise has never been expressly confided by the Legislature to any municipality or local political subdivision of the government, nor does any section of our State Constitution require the Legislature to do so, not even section 163, which reads:

"No street, railway, gas, water, steam heating, telephone, or electric light company, within a city or town, shall be permitted or authorized to construct its tracks, lay its pipes or mains, or erect its poles, posts or other apparatus along, over, under or across the streets, alleys or public grounds of a city or town, without the consent of the proper legislative bodies or boards of such city or town being first obtained; but when charters have been heretofore granted conferring such rights, and work has in good faith been begun thereunder, the provisions of this section shall not apply."

The provisions of this section are by its very terms applicable only to those utilities which use the streets, alleys, or public grounds of a municipality, and a ferry of course, does not do so. The case of People's Transit Co. v. Louisville Railway Co., 220 Ky. 728, 295 S. W. 1055, construing this section 163, involved a utility which used the public streets of the city of Louisville. It did not decide that the granting of the franchise of a utility which did not use the streets, alleys, or public grounds of a municipality must be confided to some other local political subdivision of the government or that, even if not so confided, the provisions of section 164 were applicable to the grant when made by the sovereignty, in the person of the Legislature, itself. Returning to the provisions of sections 1800 to 1821 of our Statutes, above mentioned, an analysis of them discloses that the application to establish a ferry must be addressed to the county court and the franchise is obtained when that court enters its judgment establishing the ferry. The county court to which jurisdiction over this matter is confided is not the governing body of the county, for that body is the fiscal court or county commissioners. In the exercise of this jurisdiction, the county court is not

544

acting in a legislative or executive capacity for the county, but in a judicial capacity to determine whether the conditions precedent to the granting of a ferry franchise as provided for in the Statutes have been complied with or not. If they have, then the county court must by its judgment establish the ferry. That this is so may be seen from the fact that such judgment, unless void when entered, cannot be collaterally attacked and can only be directly assailed on appeal as in other judicial proceedings. It was so held in Decker v. Tyree, 204 Ky. 302, 264 S. W. 726, 728, where a collateral attack was made on a judgment of a county court establishing a ferry. We there said:

> "The jusisdiction to grant ferry privileges under sections of the statute supra is exclusively conferred upon the various county courts in the commonwealth, and for that purpose it is a court of original as well as exclusive jurisdiction, and the same presumptions in favor of its jurisdiction, in collateral attacks of its judgments in such cases, will be applied as is done to judgments of superior courts of general jurisdiction."

To the same effect is Hatton v. Turman, 123 Ky. 844, 97 S. W. 770, 98 S. W. 1000, 30 Ky. Law Rep. 194, 382.

Acting thus in a judicial capacity, the county court exercises the judicial power of the commonwealth. The franchise obtained by the entry of the county court's judgment establishing the ferry flows, not from any action on the part of any local governing body, but from the action of the Legislature as expressed in the ferry statute. If this be so, then the franchise is not a contract between the county or municipality and the owner of the ferry, but is one between him and the state, and the authorities so hold. In Willis v. Calhoun, 145 Ky. 95, 140 S. W. 199, 202, a case involving a ferry franchise, we said:

> "The grant of a ferry right is a contract between the person to whom it is given and the state, and prior to the statute of 1851, which limited the duration of such franchises to 20 years, all grants, unless it was otherwise specifically provided therein, were perpetual. Dufour v. Stacey, 90 Ky. 288, 14

S. W. 48, 12 Ky. Law Rep. 268, 29 Am. St. Rep. 374, and Carter v. Kalfus, 6 Dana, 43.''

And in Dufour v. Stacey, 90 Ky. 288, 14 S. W. 48, 49, 12 Ky. Law Rep. 268, 29 Am. St. Rep. 374, we find:

"A ferry franchise is the subject of contract between the commonwealth and grantee, and that a valuable consideration passes from the latter to the former, whereby a property right becomes vested."

Thus we see that the Legislature has, by the ferry statutes, reserved to itself, as it had a right to do, this matter of the granting of a ferry franchise. This being true, there is no room for the argument made by the appellant that in granting to the fiscal court control over the highways of the county, the Legislature by implication also confided to it the granting of ferry franchises; it being argued that a ferry is but the extension of a road across a stream of water. The case of Irvine Toll Bridge Co. v. Estill County, supra, so strongly relied upon by the appellant in support of that argument, is clearly not applicable. That case dealt with a toll bridge, but nowhere had the Legislature expressly or by implication withheld from the fiscal courts the granting of franchises for toll bridges within their counties. On the contrary, under the various sections of the Statutes quoted in that opinion, we held that the Legislature having confided to the fiscal courts of the various counties the control of all roads and bridges not state highway projects within their respective counties, by clear implication the right to grant a franchise to construct and operate a tollbridge across a navigable stream within the county or upon which the county abutted was also confided to that political subdivision of our government.

But with ferries, as we have seen, we find a different situation. Our present ferry statute is substantially the same as that of 1806, which, with but a few changes, has been carried forward in the various revisions of our statute law to the present date. See Burke v. Layoff, 178 Ky. 588, 199 S. W. 775. Thus we see that from the very earliest times, our Legislature has withheld from the counties and cities the right to grant these franchises and has by its general laws granted the franchises itself on the conditions precedent being found to exist in a judicial proceeding in the county court.

As the franchise to operate a ferry flows from the Legislature and not the county or municipality, it follows that the provisions of section 164 of our State Constitution have no application and that the granting of the ferry franchise without a compliance with the terms of that section of the Constitution was not a void act. We are therefore unable to agree with the first contention of the appellant.

The second contention of the appellant raises a very serious question, involving almost all the ferries of this state as well as those of most of our sister states. With the advent of the automobile and the improvement of state highways, traffic upon these arteries has long since ceased to be purely of a local character, and we dare say that there can be found in this state, whether upon a stream that divides it from another state or upon a stream that flows entirely within its boundaries, scarcely a ferry which does not do an interstate as well as an intrastate business. Especially is this so where the ferry, though operating entirely on an intrastate stream, connects from shore to shore a highway of national importance upon which tourists and others bound across our state travel.

To what extent, then, may a state regulate or control such ferries, though they be engaged in interstate commerce? The answer requires a review of the leading decisions of the Supreme Court upon the subject.

The first case of major importance is that of Conway et al. v. Taylor's Ex'r, 1 Black, 603, 631, 17 L. Ed. 191, a case which reached the Supreme Court on a writ of error from this court. In that case, the appellees were the owners of a ferry franchise granted by this state for the operation of a ferry between Newport, Ky., on the shore of the Ohio river and the state of Ohio. The appellants began the ferriage of passengers and freight between the state of Ohio and the town of Newport without having obtained any franchise to do so. The appellees then brought suit to enjoin the invasion of their ferry rights. Pending the litigation, the appellants procured a franchise from the state of Ohio. The lower court enjoined the appellants from landing in Newport for the purpose of disembarking passengers or freight brought over from the Ohio shore or of embarking passengers or freight to be carried to the Ohio shore. On appeal, the

injunction was, by this court, restricted to the prohibition of taking on passengers and freight in Kentucky to be carried to the Ohio shore in violation of the appellee's ferry franchise. On writ of error to the Supreme Court, our judgment was affirmed. In the course of its opinion, the Supreme Court said:

> "The franchise (appellee's) is confined to the transit from the shore of the State. The same rights which she (Kentucky) claims for herself she concedes to others. She has thrown no obstacle in the way of the transit from the States lying upon the other side of the Ohio and Mississippi. She has left that to be wholly regulated by their ferry laws. . .
>
> "Very few adjudged cases have been brought to our notice in which the ferry rights they authorize to be granted have been challenged; none in which they have been held to be invalid.
>
> "A ferry franchise is as much property as a rent or any other incorporeal hereditament, or chattels, or realty. It is clothed with the same sanctity and entitled to the same protection as other property."

And in discussing the argument that the injunction granted was a burden or limitation upon interstate commerce, that court said:

> "The language of the Constitution to which this objection refers is as follows: 'The Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.' Art. 1, sec. 8, clause 3.
>
> "The character and extent of the power thus conferred, and the boundaries which separate that power from the powers of the States touching the same subject, came under discussion in this court for the first time, in Gibbons v. Ogden (9 Wheat., 1 [6 L. Ed. 23]). It was argued on both sides with exhaustive learning and ability. The judgment of the court was delivered by Chief Justice Marshall. The court said: 'They' (state inspection laws) 'form a portion of the immense mass of legislation which embraces everything within the territory of a State not surrendered to the General Government; all which can be most advantageously exercised by

the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, etc., are parts of this mass.' . . .

"Undoubtedly, the States, in conferring ferry rights, may pass laws so infringing the commercial power of the nation that it would be the duty of this court to annul or control them. 13 How. 519 (14 L. Ed. 249), Wheeling Bridge case. The function is one of extreme delicacy, and only to be performed where the infraction is clear. The ferry laws in question in this case are not of that character. We find nothing in them transcending the legitmate exercise of the legislative power of the state."

And so the matter rested until the Gloucester Ferry case was decided. Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 S. Ct. 826, 835, 29 L. Ed. 158. In that case, the facts were these: The ferry company was a New Jersey company with its headquarters and domicile in New Jersey. It ferried passengers and freight between New Jersey shore and the Pennsylvania shore, landing at a dock it leased in Philadelphia. The state of Pennsylvania undertook to levy a tax on the capital stock of the ferry company, it being in the nature of a franchise tax, and the question was as to the right of the state of Pennsylvania to so tax the ferry company. In denying such right, the court said:

"It is true that from the earliest period in the history of the government the states have authorized and regulated ferries, not only over waters entirely within their limits, but over waters separating them; and it may be conceded that in many respects the states can more advantageously manage such interstate ferries than the general government; and that the privilege of keeping a ferry, with a right to take toll for passengers and freight, is a franchise grantable by the state, to be exercised within such limits and under such regulations as may be required for the safety, comfort, and convenience of the public. Still, the fact remains that such a ferry is a means, and a necessary means, of commercial intercourse between the states bordering on their dividing waters, and it must, therefore, be conducted without

the imposition by the states of taxes or other burdens upon the commerce between them. . . .

"While it is conceded that the property in a state belonging to a foreign corporation engaged in foreign or interstate commerce may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void as an interference with, and an obstruction of, the power of Congress in the regulation of such commerce."

It will be noted that although the state of Pennsylvania was denied the right of levying a franchise tax upon the ferry in question because such a tax was on the business of engaging in interstate commerce and so necessarily a burden upon it, the court did not so far recede from the position it had taken in the Conway case as that it could not say, as indeed it did:

"The privilege of keeping a ferry, with a right to take toll for passengers and freight, is a franchise grantable by the state, to be exercised within such limits and under such regulations as may be required for the safety, comfort, and convenience of the public."

We shall find this thought appearing again in the subsequent opinions of the Supreme Court where these ferry franchises were involved.

In 234 U. S. appear two ferry cases, the first being found on page 317 of that volume, 34 S. Ct. 821, 825, 58 L. Ed. 1330, styled Port Richmond Ferry v. Hudson County, and the second appearing on page 333 of 234 U. S., 34 S. Ct. 826, 827, 58 L. Ed. 1337, 52 L. R. A. (N. S.) 574, and styled City of Sault Ste. Marie v. International Transit Company. Both of the opinions were written by Mr. Justice Hughes, now our Chief Justice. In the first case, the proper officials of the state of New Jersey undertook to regulate the rate of fare on ferries operating from the Jersey shore, although the particular ferry in question had its franchise from the state of New York.

The Supreme Court upheld such regulation. In the course of its opinion, the court said:

"Coming, then, to the question now presented—whether a state may fix reasonable rates for ferriage from its shore to the shore of another state—regard must be had to the basic principle involved. That principle is, as repeatedly declared, that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive; that, in other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and that, when Congress does act, the exercise of its authority overrides all conflicting state legislation. . . . It is this principle that is applied in holding that a state may not impose direct burdens upon interstate commerce, for this is to say that the states may not directly regulate or restrain that which, from its nature, should be under the control of the one authority, and be free from restriction save as it is governed by valid Federal rule. . . . But, in the case of ferries, we have a subject of a different character. . . . Ferries, such as are involved in the present case, are simply means of transit from shore to shore. These have always been regarded as instruments of local convenience, which, for the proper protection of the public, are subject to local regulation; and where the ferry is conducted over a boundary stream, each jurisdiction with respect to the ferriage from its shore has exercised this protective power. There are a multitude of such ferries throughout the country, and, apart from certain rules as to navigation, they have not engaged the attention of Congress. We also put on one side the question of prohibitory or discriminatory requirements, or burdensome exactions imposed by the state, which may be said to interfere with the guaranteed freedom of interstate intercourse, or with constitutional rights of property. The present question is simply one of reasonable charges. . . . The fundamental test, to which we have referred must be applied; and the question is whether, with regard to rates, there is any inherent necessity for a single regulatory power over these numerous ferries across boundary streams; whether, in view of the

character of the subject and the variety of regulation required, it is one which demands the exclusion of local authority. · Upon this question we can entertain no doubt. It is true that in the case of a given ferry between two states there might be a difference in the charge for ferriage from one side, as compared with that for ferriage from the other. But this does not alter the aspect of the subject. The question is still one with respect to a ferry, which necessarily implies transportation for a short distance, almost invariably between two points only, and unrelated to other transportation. It thus presents a situation essentially local, requiring regulation according to local conditions . . . The practical advantages of having the matter dealt with by the states are obvious, and are illustrated by the practice of one hundred and twenty-five years. And in view of the character of the subject, we find no sound objection to its continuance. If Congress at any time undertakes to regulate such rates, its action will, of course, control.''

In the International Transit Company case, the city of Sault Ste. Marie, Mich., undertook to levy a license tax on a ferry operating from the Canadian shore under a Canadian franchise to engage in such ferry business; the license tax being a condition precedent to such ferry company's right to land its freight and passengers on the Michigan shore in Sault Ste. Marie. Holding such a license tax a burden on interstate commerce, the Supreme Court declared it invalid. In that opinion, the court said:

''It will be observed that the question is not simply as to the power of the state to prevent extortion and to fix reasonable ferry rates from the Michigan shore; it is not as to the validity of a mere police regulation governing the manner of conducting the business in order to secure safety and the public convenience. . . . The ordinance goes beyond this. The ordinance requires a municipal license; and the fundamental question is whether, in the circumstances shown, the state, or the city, acting under its authority, may make its consent a condition precedent to the prosecution of the business. If the state, or the city, may make its consent necessary, it may withhold it. . . . Has the state of Michigan

the right to make this commercial intercourse a matter of local privilege, to demand that it shall not be carried on without its permission, and to exact as the price of its consent—if it chooses to give it—the payment of a license fee?

"This question must be answered in the negative. . . .

"The fundamental principle involved has been applied by this court in recent decisions in a great variety of circumstances, and it must be taken to be firmly established that one otherwise enjoying full capacity for the purpose cannot be compelled to take out a local license for the mere privilege of carrying on interstate or foreign commerce. . . .

"Assuming that, by reason of the local considerations pertinent to the operation of ferries, there exists, in the absence of Federal action, a local protective power to prevent extortion in the rates charged for ferriage from the shore of the state, and to prescribe reasonable regulations necessary to secure good order and convenience, we think that the action of the city in the present case in requiring the appellee to take out a license, and to pay a license fee, for the privilege of transacting the business conducted at its wharf, was beyond the power which the state could exercise either directly or by delegation."

The last case to be noted is that of Mayor of Vidalia v. McNeely, 274 U. S. 676, 47 S. Ct. 758, 761, 71 L. Ed. 1292. In this case the town of Vidalia, La., undertook to prohibit the operation of a ferry across the Mississippi river between Vidalia and Natchez, Miss., because its owner had not procured and paid for a license from the town of Vidalia to engage in that business. The Supreme Court held that the town of Vidalia could not "make its consent and license a condition precedent to a right to engage" in the business of conducting the interstate ferry. The court stated the question involved thus:

"The question is not whether the town may fix reasonable rates applicable to ferriage from its river front or may prescribe reasonable regulations calculated to secure safety and convenience in the conduct of the business, but whether it may make

its consent and license a condition precedent to a right to engage therein.''

But while holding that the town could not make its consent and license a condition precedent to the right to engage in the ferriage in question, the court was careful to point out the power yet residing in the states in this language:

"This court always has recognized that ferries operated across boundary waters between states simply as a means of transit from shore to shore should be deemed instruments of local convenience, and subject to local regulation, to the extent that, in the absence of congressional action, each state may act with respect to the ferriage from its shore.''

The opinion then quotes from the Port Richmond Ferry Company case that portion of the opinion in that case which we have copied above. Before closing, the court in the McNeely case further said:

"It must be conceded that the designation of places for ferry landings along the river bank within the town limits is a function which primarily belongs to the town and is not ordinarily subject to judicial control. But here the town proceeded on the erroneous theory that the complainant's ferry need not be considered. Not only was no new landing place assigned for his ferry, but the place theretofore and then in actual use for it was assigned to the competing ferry. In this the town plainly deviated from its duty in the premises, for it was under the same legal obligation to accord a landing place to one ferry as to the other.''

From this resume of the applicable opinions of the Supreme Court, we conclude that the rule announced by that tribunal, and which must guide us in the determination of the instant case, comes to this: That ferries have always been regarded as instruments of local convenience which, for the proper protection of the public, are subject to local regulation, and that while a state may not, as a condition precedent to the right to engage in the business of conducting interstate commerce by means of a ferry, require the operator thereof to procure and pay for a license to do so, yet the state may so far

554

as ferriage from its shores is concerned exercise its protective power to prevent extortion in the rates charged for ferriage and to prescribe reasonable regulations necessary to secure the safety, comfort and convenience of the public. In the application of the principle thus deduced it is not necessary that we examine our ferry statutes in their entirety. It is so firmly established that the constitutionality of a statute may not be attacked by one whose rights are not affected by it, that we need spend no time in the elaboration of that proposition. To the extent only that the law affects injuriously the right of the party invoking the aegis of the Constitution may it be questioned by that party. How, then, does the ferry statute as carried into the injunctive relief granted in this case affect the appellant? Only to the extent that the ferry company is forbidden to land its boats within a mile and a half of appellee's landing for the purpose of receiving freight and passengers for ferriage from the Kentucky shore to the Illinois shore. See Kentucky Statutes, sec. 1820. In this, the injunction is practically the same as that sustained by the Supreme Court in the Conway case supra. The ferry company may land within the prohibited area for the discharge of passengers and freight ferried from the Illinois shore to the Kentucky shore. It may, so far as the injunction is concerned, land its boats anywhere outside the prohibited area for the purpose of receiving as well as discharging freight and passengers to be ferried or already ferried across the river. The appellant is not forbidden to engage in the ferry business. It is simply restricted in the manner stated and to that extent only. Is the statute as thus applied to the appellant a reasonable regulation to secure the safety, comfort, and convenience of the public? That, in turn, will depend on the facts as disclosed in the record. We shall, therefore, at this point, state them.

On being granted his ferry franchise in 1924, Birney at once equipped himself with a barge of sufficient capacity to carry the passenger and freight business which has sought ferriage at this point. This barge was propelled by a gasoline launch. Since the granting to him of his franchise, Birney has maintained a twenty-four hour service with his ferry the entire year round, and with the exception of possibly one or two occasions, when an abnormally large number of automobiles wanted ferriage across the river, his service has been adequate

and entirely satisfactory for the business involved. Cairo, Ill., is a city of from 15,000 to 18,000 people. East Cairo, Ky., is but a name; there being no incorporated town at that point nor even an unincorporated village. It consists of perhaps one or two houses together with a railroad station. The Mobile & Ohio and the Illinois Central Railroads cross on a bridge from Illinois into Kentucky at or near Cairo and East Cairo. The record shows that travelers on the railroads from points east and south of East Cairo to Cairo usually alight at East Cairo and take the ferry across the river, because by that method they can save from 70 to 75 cents in fare. Their return trip is made in the same manner. East Cairo is located on the Ohio River very close to its junction with the Mississippi. Wickliffe, the county seat of Ballard county, lies about five miles down the Mississippi river from East Cairo. There is a dirt road which runs from Wickliffe to East Cairo. This road as it leaves Wickliffe runs along the river bank for a considerable distance, then crosses the railroad track, which at this point parallels the river, and then continues northwardly on the east side of the railroad track. After proceeding some distance in this fashion, the road then crosses back over the railroad track to the river bank and runs along the bank to a point near the place where Birney's ferry lands. There is a short private road from this Wickliffe road to Birney's ferry. There is another dirt road leading to Birney's ferry and coming from the north and east on the Kentucky side of the Ohio river and running from Barlow, Ky., through Holloway to East Cairo. A ferry operates between Holloway, Ky., and Mound City, Ill.; but as the schedule is only an hourly one, there is, as the record shows, quite a good deal of traffic which, to avoid delay, comes down to Birney's ferry at East Cairo. Birney maintains no regular schedule, but goes back and forth across the river as the traffic demands and requires. During the winter months, and especially when the water in the Ohio river reaches the 34-foot stage as shown on the gauge at Cairo, the road between East Cairo and Wickliffe is submerged and after the water recedes cannot be traveled by vehicular traffic until it has dried out. Therefore, during this period vehicular traffic coming from the south to reach Cairo must embark on the ferry operated by the appellant and running between Wickliffe and Cairo. However, when the road between Wick-

liffe and Cairo is passable, and especially in the summer months, vehicular traffic, instead of embarking on the appellant's ferry at Wickliffe, runs on down to East Cairo and uses Birney's ferry, thereby saving from twenty minutes to one-half hour in time required to make the journey from Wickliffe to Cairo, not to mention some little toll. In the summer of 1928, the appellant, in order to take advantage of this traffic that was going to East Cairo, began the ferriage of passengers and vehicles between Cairo and East Cairo. The ferry company did not maintain a twenty-four hour service and it operated its ferry between these two points only when vehicular traffic was going to East Cairo by road from Wickliffe. During the unprofitable hours of the day and the unprofitable months of the year, the ferry company let Birney have the field to himself, but when the cream came upon the milk it helped him to skim it. The maintenance of a twenty-four hour service between East Cairo and Cairo throughout the year is a great convenience to the people of these communities and to the hinterland, for in the winter months the only way foot passengers have to get to Cairo from the hinterland is by train or by train to East Cairo and then by this ferry, and the use of the ferry is quite a saving to them in money. Further, the ferry is a big convenience to vehicular traffic which comes from the north and the east and which does not wish to wait at Holloway for the schedule of the ferry at that point. However, the operation of Birney's ferry at East Cairo during many of the twenty-four hours of the day, and especially at night and during the winter months, yields him but scant, if any profit. He maintains the ferry during these unprofitable periods in order that he may be able to make a profit on his venture during the summer months. The appellant does not purpose operating between Cairo and East Cairo except during these profitable periods. When it does, Birney's profits shrink very materially. His rate of toll is fixed in the franchise granted him; the state having, under the decisions of the Supreme Court, the undoubted right to fix such tolls, at least for ferriage from this state. He must, then, for his profit depend on the volume of the business. It is to the interest and convenience of the public that the ferry be maintained here, throughout the year and on a twenty-four hour schedule. But this cannot be insured, unless Birney be protected to some extent in his custom or business. The sovereignty has undertaken from very ancient

times the protection to a reasonable extent of the business or custom of a ferry, as may be seen from a reading of the opinion of Chancellor Kent in the case of Newburgh & C. Turnpike Road Co. v. Miller, 5 Johns. Ch. (N. Y.) 101, 111, 9 Am. Dec. 274. This is done on the fundamental idea that unless the ferry owner be so protected, he will be open to raids more or less sporadic upon his custom, and thus he will be forced to share to a material extent his profitable business while continuing to be compelled to carry on alone the unprofitable, the result being that it will be difficult to interest any one in the carrying on of such a ferry business. The ferry owner cannot practice extortion, for the state may regulate his tolls. He must, if he be any sort of a business man, foresee some profit or he will not engage in the business. The public convenience requires the operation of a ferry at times and periods when it is not profitable as well as when it is profitable. This is a condition common to all other public carriers as well as ferries. The ferry owner cannot complain if he is compelled to operate during unprofitable periods if he is protected to a reasonable extent in his operation during the profitable ones. But to insure the public convenience in the operation of ferries at unprofitable times, some measure of protection must be given to the operation when the traffic is there from which a profit can be made. It is this idea embodied in federal legislation which now protects interstate railroads from invasion into their fields of operation by other railroads where otherwise the result would be a destruction of the profit of the invaded. Such legislation is based on the idea that the public interest requires that the railroad be protected to a reasonable extent in its custom. The same idea underlies the requirement that motorbus lines must before invading the field of those already there procure certificates of public convenience authorizing them to do so. It is the same idea underlying the report recently made by the committee appointed to bring some order out of chaotic taxicab situation in New York. In the instant case, East Cairo is practically a country side. The ferry traffic is not shown to be very thick. The banks of the river are such that a landing may be effected by the appellant as well and as easily without the prohibited area as within it. A landing a mile and a half down the river will yet be between East Cairo and Wickliffe and will yet afford the appellant the opportunity of

securing for its ferry the carriage of such traffc from Kentucky to Illinois as chooses to take its ferry over that of the appellee. Indeed, it can secure such of the traffic as goes from Wickliffe northwards on the county road Cairo bound as the merits of its service and rates can command. Under the circumstances, the prohibition of the landing of appellant's ferry for the purpose of taking on freight and passengers for ferriage across the river from the Kentucky shore is not an unreasonable regulation. On the contrary, the facts disclose it to be a reasonable one to secure the public convenience in the maintenance and operation of a twenty-four hour service the year round of a ferry at East Cairo. The quoted excerpt from the McNeely case as to the right to reasonably regulate the place of landing seems to be applicable.

What we have said being true, we are of the opinion that the statute here assailed by the appellant is not an unreasonable burden on interstate commerce, but is one of those regulations which, at least until Congress acts, is left within the powers of a state.

Our conclusions thus supporting the judgment of the lower court, it is affirmed.

Whole court sitting.