### UNITED STATES v. PUGET SOUND NAV. CO.
### No. 21037.

District Court, W. D. Washington, N. D.
Aug. 30, 1938.

J. Charles Dennis, U. S. Atty., Gerald Shucklin, Asst. U. S. Atty., and Charles P. Moriarty, all of Seattle, Wash.

Bogle, Bogle & Gates, of Seattle, Wash., for defendant.

BOWEN, District Judge.

■ "A ferry is a continuation of the highway from one side of the water over which it passes to the other, and is for transportation of passengers or of travelers with their teams and vehicles and such other property as they may carry or have with them." St. Clair County v. Interstate Sand & Car Transfer Co., 192 U.S. 454, 466, 24 S.Ct. 300, 304, 48 L.Ed. 518.

"The term 'ferry' does not apply to a line of steamboats from Albany to New York. 'To speak of a ferry from New York to Albany is as great an abuse of terms as to talk of a ferry from New Orleans to St. Louis or Pittsburgh, and even from New York to Liverpool.' North River Steamboat Co. v. Livingston, 3 Cow., N.Y., 713, 748." 25 C.J. 1050.

"A ferry may be said to be a necessary service by specially constructed boat to carry passengers and property across rivers or bodies of water from a place on one shore to a point conveniently opposite on the other shore and in continuation of a highway making connections with a thoroughfare at each terminus. Anciently, a ferry performed the same service of carrying people and cargo across a river, small lagoon, or narrow lake on the water craft as was later, and is, carried by a bridge structure above the water. This service was extended to larger lakes and other larger bodies of water in extension of, or forming a connecting link to, highways." Neterer, J. in U. S. v. Canadian Pac. Ry. Co., D.C., 4 F.Supp. 851, at page 853.

"The essential element involved in a ferry franchise is the exclusive right to transport persons and horses, and vehicles with which they travel, as well as such personal goods as accompany them from one shore to the other, over the interven-ing water, for the toll. Broadnax v. Baker, 94 N.C. 675, 681, 55 Am.Rep. 633." Words and Phrases, First Series, Vol. 3, at page 2752.

"A ferry franchise emanating from the supreme power of the state or its authorized mandatories is a grant to a named person empowering him to continue an interrupted land highway over the interrupting waters." Vallejo Ferry Co. v. Solano Aquatic Club, 165 Cal. 255, 131 P. 864, 871, Ann.Cas.1914C, 1197.

"A ferry, in its ordinary sense, is but a substitute for a bridge where a bridge is impracticable, and its end and use are the same. Like a toll bridge, it is a franchise created for the use and convenience of the traveling public, as a link in the highway system of the country, and by no means includes the transportation of goods, wares, and merchandise by themselves, or, in other words, the carrying trade of modern commerce." People v. San Francisco & A. R. Co., 35 Cal. 606, 619.

"It is impossible in a general way to specify to what distance over intervening waters ferries may be operated. A ferry could not be established between New York and Boston, or New York and Newport or Philadelphia. The distance would be too great, and the business of transporting passengers and freight between such distant places would be that of common carriers upon public waters." Mayor, etc., of New York v. New Jersey Steam Boat Transportation Company, 106 N.Y. 28, 12 N.E. 435, 436.

In Port Richmond & Bergen Point Ferry Co. v. Hudson County, 234 U.S. 317, at page 332, 34 S.Ct. 821, at page 826, 58 L.Ed. 1330, involving a state's power to fix ferriage rates for interstate ferries, the court said: "* * * The question is still one with respect to a *ferry* which necessarily implies transportation for a short distance, almost invariably between two points only, and unrelated to other transportation. * * *"

From a stipulation between the parties, it appears that the defendant, for the same period here involved, has "paid customs overtime for services rendered in connection with passengers' baggage to vessels operating on international routes and in connection with baggage, merchandise and freight carried on the vessel Iroquois in accordance with law and regulations." (Stipulation, July 22, 1937, P. 12)

The parties have further stipulated "* * * that all of said vessels and those vessels involved in this action carry passengers, vehicles, baggage, mail, merchandise and freight, issuing bills of lading for such merchandise and freight, and in transporting such merchandise and freight rates were charged between all ports and way ports to shippers delivering the merchandise and freight for shipment, said rates being collected either from the shipper or the consignee, Exhibit 85 being illustrative of various freight tariffs in effect during the years 1931 to 1935, inclusive, on intrastate routes, and on freight vessels such as the Aloha and Commanche operating on irregular routes, no such schedules being in effect on international routes, on which competitive rates were charged for merchandise and freight transported. Provided, however, that the vessel Iroquois carried only a negligible amount of merchandise from or to Victoria, because of the small amount offered, destined to or originating at Port Townsend or Port Angeles; that the vessel Olympic refused to accept or carry merchandise and freight from or to Victoria; and that the vessels Puget, City of Angeles, Rosario and City of Bremerton refused to accept or carry merchandise and freight from or to Sidney, but did carry merchandise and freight between other ports on their route.

"13. That the use of vessels on Puget Sound and adjacent waters for the carriage of vehicles developed commencing on or about the year 1920. The existing freight and passenger, and passenger vessels were reconstructed to carry vehicles on the car or main deck and the majority of vessels so operating on Puget Sound and adjacent waters during the years 1931 to 1935, inclusive, were vessels which had been so converted." (Stipulation, pp. 9-10)

The purpose of such reconstruction was to accommodate loading and unloading of automobiles, with or without drivers, at the end instead of at the side of a vessel; but it does not appear that such reconstruction in any way hindered or affected the other transportation business of the vessels in question. At the argument before the court neither side found fault with the principle that "the character of the service rendered and not the design of the vessel employed is the determining feature". That is the correct principle to be applied in this case.

The state certificates (Exhibit 79) and the published tariff (Exhibit 85) under which the vessels operated intrastate authorized them to, and they did, carry for hire for the public every conceivable kind of merchandise. It does not appear that the foreign business of the vessels (except in a few instances) was any more restricted. Except in a few instances for reasons other than restricted business classification, no attempt was made to confine the business of the vessels to, the carriage of travelers and such property as they might have with them. In general, the business was held out to, and did include, not only the carriage of passengers and automobiles with passengers, but also unrestricted transportation of all kinds of transportable property. As to that property the freight charges were not collected only from travellers, as is done in the case of a ferry business, but were collected from either the shippers or consignees. And no business of the vessels was done with particular reference to water connections between specific overland highways, of which there are many serving the myriad of communities in and about the Puget Sound region. The character of the business done was essentially that of general water borne commerce consisting of all kinds of transportation, covering distances varying from a few to a hundred miles to and from those communities, and conducted upon Puget Sound and its adjacent waters, including the high seas (Exhibits 85 and 51).

This court's decision, therefore, is that defendant's vessels doing that business were not "international ferries" within the meaning of Title 8 U.S.C., Secs. 109a, 109b, 8 U.S.C.A. §§ 109a, 109b, and that the defendant should pay for the Immigration inspectors' overtime service here sued for.

Defendant's motion for special findings and conclusions or for judgment will be denied.

Findings of fact, conclusions of law and judgment may be settled upon notice or stipulation.