399 F.2d 716
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FRONTIER GUARD PATROL, INC., d/b/a Frontier Guard and DeLue, Inc., Colorado Guard-Patrol Service, Inc., and Patrol Services, Inc., Respondents.
 No. 9742.
 United States Court of Appeals Tenth Circuit.
 August 23, 1968.
 
 Burton Raimi, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Provost, Asst. Gen. Counsel, Elliott Moore and Thomas Smith, Attys., N.L.R.B., on the brief), for petitioner.
 V. G. Seavy, Jr., Denver, Colo., for respondents.
 Before PHILLIPS, HILL and HICKEY, Circuit Judges.
 ORIE L. PHILLIPS, Circuit Judge.
 
 
 1
 This case is before the court on petition of the National Labor Relations Board[1] for enforcement of its order against Frontier Guard Patrol, Inc.,[2] Colorado Guard-Patrol Service, Inc.,[3] and Patrol Services, Inc.[4] They will hereinafter be referred to collectively as the respondents.
 
 
 2
 At all times here material, Arthur R. Gilmore was president, director, and a principal stockholder of Colorado Guard and Gerald R. DeLue was president, director, and a principal stockholder of Frontier Guard.
 
 
 3
 Frontier Guard is a Colorado corporation, created in 1956. At all times here material, it was engaged in the operation of a burglar alarm system as its major business, which consisted of the sale to and installation of burglar alarms in private establishments and the maintenance of an electronic device in its office, which gave notice when any one of the burglar alarms was set off. It also maintained a dispatcher, who, on receipt of notice of the setting off of an alarm, directed either a public or private police agency to go to the scene of the alarm. It was also engaged in the operation of a patrol service, more particularly referred to hereinafter.
 
 
 4
 Colorado Guard was at all times here material engaged solely in the furnishing of patrol services. It had no burglar alarm business.
 
 
 5
 Neither Frontier Guard nor any of its officers and shareholders ever owned any stock in Colorado Guard. Neither Colorado Guard, nor any of its officers and shareholders ever held any stock in Frontier Guard, and there were no common officers or directors of the two corporations. Until November 12, 1964, Frontier Guard and Colorado Guard maintained separate books, records, and bank accounts; each had its own telephone and telephone number; each sent separate bills for its services to its respective employers; each separately paid its employees; each had a separate municipal license under which it operated; and each maintained separate workmen's compensation accounts and separate federal withholding accounts for its employees and made separate federal tax returns. There was no interchange of patrol cars and such cars were separately parked and serviced by the owners thereof. Frontier Guard had two supervisors, Anderson and Allen, and Colorado Guard had one supervisor, Condos.
 
 
 6
 Frontier Guard commenced operations in the year 1956, and at all times since its place of business has been 2915 West Seventh Avenue, Denver, Colorado. In the fall of 1964, Frontier Guard's burglar system served about 700 customers. In early 1964, in addition to its burglar alarm business, Frontier Guard operated four patrols which served residential and commercial customers by checking and inspecting their premises at regular intervals for unlocked doors, open windows, and evidences of unlawful entry. Each patrol functioned with an armed and uniformed guard or patrolman, who drove the route thereof in an automobile owned by Frontier Guard. Each patrol served designated customers in a fixed geographical area. While making his rounds, a patrolman maintained radio contact with a dispatcher located at Frontier Guard's office and reported any situation that needed police action. The dispatcher directed either a public or a private police agency to the scene reported by the patrolman.
 
 
 7
 Colorado Guard was incorporated in February 1964. Its place of business was in Denver, Colorado. It took over a patrol service operated by one Whittaker, with whom Gilmore became associated.
 
 
 8
 By a contract dated March 26, 1964, and effective March 31, 1964, Colorado Guard purchased from Frontier Guard all the latter's customer accounts and good will in two merchant patrol districts, known as D and E Patrols, theretofore operated by Frontier Guard.
 
 
 9
 In September 1964, Gilmore purchased Whittaker's interest in Colorado Guard, and in October 1964, Colorado Guard purchased the business of Englewood[5] Merchant Police, Inc., which was operating a patrol.
 
 
 10
 Colorado Guard operated its patrol service substantially in the same manner as Frontier Guard operated its patrol service.
 
 
 11
 Until Patrol Services came into being in November 1964, Colorado Guard maintained its own headquarters and handled most of its dispatching business. However, Frontier Guard for fixed fees furnished Colorado Guard services relating to the patrols it had purchased from Frontier Guard, being dispatching services, desk space, and certain billing and administrative services.
 
 
 12
 At some time in October, Gilmore and DeLue commenced to discuss the possibility of merging their businesses. By mid-October, they were exploring the possible advantages and disadvantages of combining the patrols operated by each. In the ensuing two weeks, Gilmore and Anderson, a Frontier Guard supervisor, rode together in patrol cars to gain familiarity with the respective patrols of Frontier Guard and Colorado Guard and explore the possibility of more efficient operation by consolidation.
 
 
 13
 In October 1964, primarily by reason of geographical convenience, Frontier Guard took over certain of Colorado Guard's customers in north Denver and the latter took over some of Frontier Guard's customers in south and southeast Denver.
 
 
 14
 In October 1964, Frontier Guard and Colorado Guard each reduced the rank of some of its employees, but there was no reduction in wages or in the type of services performed.
 
 
 15
 In October 1964, Frontier Guard undertook the preparation of Colorado Guard's payroll and about the same time Frontier Guard's dispatchers began to log calls for Colorado Guard's patrolmen. These services related to the patrols purchased by Colorado Guard from Frontier Guard. During the last two weeks in October, DeLue and Gilmore apprised the patrolmen of their respective companies that a merger was on the way, and when effected, Gilmore would have a status equal to that of DeLue in his relation to all the patrols, and that changes in wages, hours, and mode of operation were likely to be forthcoming. However, no changes were made in October.
 
 
 16
 On November 12, 1964, a pre-incorporation agreement was executed by Frontier Guard, Colorado Guard, DeLue, and Gilmore. It recited that both companies were in "the merchant patrol and guard business" and believed "that their business interests would be best served by combining certain facets of their guard and patrol operations." It provided that they would establish a new corporation to be known as Patrol Services, Inc., to be owned and operated by them jointly; that the agreement should be retroactive to November 1, 1964, for bookkeeping purposes; that Frontier Guard should lease to Patrol Services the necessary office space needed by it at 2915 West Seventh Avenue, Denver, Colorado; that Patrol Services would pay Frontier Guard therefor the sum of $110 per month as rent, and that the utilities would be furnished by Frontier Guard; that Patrol Services would also pay Frontier Guard its share of the telephone expenses, one-half of the secretarial expense, one-half of the patrol supervisors' salary of approximately $62.50 per week, and $18 per day for dispatcher services to be furnished by Frontier Guard.
 
 
 17
 The agreement further provided that Patrol Services should perform certain services for Frontier Guard by responding to notices of burglar alarms received by Frontier Guard, and should be paid therefor $75 per month by Frontier Guard.
 
 
 18
 Although the corporation was to be formed later, the pre-incorporation agreement provided that Patrol Services should commence business on or about November 1, 1964. It further provided that Patrol Services should thereafter operate the patrols formerly operated by Frontier Guard and Colorado Guard; that the patrols of Frontier Guard and Colorado Guard, the equipment used in operating such patrols, and certain other assets of each of them should be turned over to Patrol Services in exchange for stock in the latter; that Gilmore and DeLue should serve as president and vice-president, respectively, of Patrol Services, and should jointly manage its operations. Frontier Guard and Colorado Guard each received a substantial amount of Patrol Services stock.
 
 
 19
 Patrol Services was incorporated November 19, 1964. The provisions of the pre-incorporation agreement were carried out. Patrol Services took over and operated the patrol services of Frontier Guard and Colorado Guard. Frontier Guard retained its burglar alarm business and its dispatching operation and performed the dispatching service for Patrol Services. Patrol Services patrolmen responded to notices of burglar alarms received by Frontier Guard.
 
 
 20
 Prior to October 27, 1964, there was no charge of unlawful acts by the respondents, nor any claim that the respondents had any knowledge of any union or other concerted activities among any of the employees of the respondents.
 
 
 21
 During the two weeks preceding October 27, 1964, the employees of Frontier Guard and Colorado Guard began discussions respecting the making of demands upon their respective employers. They were apprehensive that the merger would adversely affect them. They had several informal and inconclusive meetings prior to October 27, 1964. On the morning of that date, a group of Frontier Guard and Colorado Guard patrolmen met in the office of Frontier Guard, after completing their patrols for the previous night, and drew up a list purporting to represent the consensus of their principal demands. Patrolman Thomas Bossen wrote these demands down on a tablet. All present agreed that Bossen should seek the advice of an attorney as to an appropriate way to present their demands to their employers. Bossen consulted a lawyer, John A. Criswell, during the day, and was advised to arrange a meeting with DeLue and on learning DeLue's reaction to consider a further course of action. Bossen telephoned the patrolmen for Frontier Guard and Colorado Guard and urged them to come to Frontier Guard's office at 6 p. m. on October 27, 1964, for a meeting of the employees. Bossen also telephoned Anderson, who had been present at the earlier meeting of that day, and told him the employees would like to meet DeLue and talk to him "over raises and things." At 4:15 p. m., October 27, 1964, Anderson advised DeLue that the men wished to meet with him at 6 p. m. of that day. Anderson knew about the previous informal meetings of the employees, but when he talked to DeLue he did not tell him what he knew about such meetings and did not tell him the men specifically wished to meet with him to talk over "raises and things."
 
 
 22
 Gilmore was out of Denver on October 27, 1964.
 
 
 23
 The patrols regularly started their rounds of inspection between 7 and 8:30 p. m. At about 6 p. m. on October 27, 1964, the patrolmen began to gather in the outer office of Frontier Guard and Bossen handed to Anderson the demands he had written down earlier in the day. These demands included a two-year contract, a 50-hour week, with a minimum of $2 per hour for patrolmen and dispatchers, paid vacations, hospitalization and sick leave. Anderson took the written demands into DeLue's office and gave them to him and told him the men wanted "to talk to him and they would probably walk out." DeLue then asked Anderson how long he had known about the employee demands and Anderson responded that he had known about the unrest for some days and that he thought the men were really unhappy. DeLue then said, "Thanks a lot for telling me" and further, "Well, let's go out and talk to them." DeLue and Anderson then went to the other office, where the men were gathered. DeLue then asked Anderson whether he was speaking for the group or for himself, and Anderson replied that he was speaking for the group. Supervisor Allen came into the meeting at about this point and DeLue asked him if he was "in on this" also and Allen replied in the affirmative. DeLue then told the employees that the demands had come as "quite a shock and surprise" to him and that he did not appreciate the way it was done; that there never had been a union at Frontier Guard; that he did not see the need for one; that the demands were ridiculous, but if there was any merit to them he would take them under consideration, and that he would also advise Mr. Gilmore when he returned, so that he might also take them under consideration. At that point, Allen got up and said that DeLue could "make a decision here and now for all of us, or else." DeLue replied, "Or else what?" to which Allen answered, "Or else we will walk out." DeLue then told the group that he regarded this as leaving him very little choice and if that was the way they felt, they could "go ahead and walk." That ended the meeting, which had consumed only four or five minutes. Thereupon, Allen got up and Anderson and Bossen immediately followed him out the door, with the rest of the employees present joining in walking out. They immediately proceeded to a motel located across the street from Frontier Guard's office to discuss what to do next. They agreed among themselves that the wage rates demanded were probably unrealistically high and appropriately could be lowered. They were unanimous, however, in deciding that they should continue to press for some concessions from management, and that in doing so they should maintain a united front. Bossen drafted a statement, which was signed by all the employees present, including Supervisors Anderson and Allen, reading:
 
 
 24
 "We, the men listed below by signature, do hereby agree not to work for the above named organization until such time as a working agreement between the men and the organization can be bound by a contract."
 
 
 25
 All the employees present signed it, and it was also signed later by Joyce Snyman, a Frontier Guard dispatcher, who was not present at the meeting.
 
 
 26
 At the same time, the employees agreed that they should immediately undertake to form a union. They went to the office of Mr. Criswell, who advised them that he would undertake to set up a nonprofit corporation as a labor organization to represent them, and that it would seek representation rights through the National Labor Relations Board. Mr. Criswell also advised them that they should immediately request reinstatement from Frontier Guard and Colorado Guard. The attorney then undertook to initiate the formation of a nonprofit organization as a union, and also delivered a letter to Frontier Guard and Colorado Guard, stating that a labor organization was in the process of formation and that a majority of the employees had authorized it to represent them. It also stated that being submitted with the letter was a request for reinstatement, signed by the employees who were then on strike. The letter was received by Frontier Guard and Colorado Guard on October 29, 1964. The request for reinstatement was signed by 16 employees, including Anderson and Allen. Two employees, Larry Moffett and Jenkyns, did not sign the request for reinstatement, and the record does not show a request for reinstatement made by them in any other manner. The request for reinstatement was unconditional.
 
 
 27
 When the employees walked out on October 27, 1964, after a meeting with DeLue, he immediately undertook to man the two patrols which Frontier Guard operated. He succeeded in getting replacements for that evening and the patrol went out on schedule. DeLue did not reach Gilmore on that evening. DeLue, working with Condos, the Colorado Guard supervisor, was also successful in manning the four patrols operated by Colorado Guard and they, too, went out on schedule that evening. DeLue stated that he assisted Condos as a courtesy.
 
 
 28
 In the operation of the patrols, Colorado Guard and Frontier Guard used both part-time and full-time patrolmen. On October 27, 1964, Frontier Guard was operating two patrols and Colorado Guard was operating four patrols. At the time of the walkout, Roger Moffett and Michael Vourexes were employed by Frontier Guard as full-time patrolmen and Eugene N. Smith, Norman R. Buskirk, Thomas H. Bossen, William R. Miller and Larry Moffett were employed by it as part-time patrolmen. At the time of the walkout, Robert L. Lisle, Charles E. Nesmith, and Emery L. Reynolds were employed by Colorado Guard as full-time patrolmen, and Aaron L. Burkhart, Michael B. Wagner, Bud W. Cady, Virgil H. Colman, and Leonard Jenkyns were employed by it as part-time patrolmen.
 
 
 29
 On October 27 and 28, 1964, Frontier Guard hired four patrolmen and two dispatchers and Colorado Guard hired four patrolmen.
 
 
 30
 On receipt of Criswell's letter on October 29, 1964, requesting recognition of Criswell as the representative of the employees and enclosing the request for reinstatement, Frontier Guard and Colorado Guard jointly employed an attorney to represent them. Thereafter, they signed and sent a joint telegram to Criswell, reading:
 
 
 31
 "We have no information concerning validity of organization purporting to represent our employee. Would discuss said validity with you Monday or Tuesday at your convenience in order to decide whether or not to bargain with said organization. Contact our attorney Tim Campbell if this is satisfactory."
 
 
 32
 As a result, a meeting was held at Criswell's office on November 2, 1964. Attending and representing Frontier Guard and Colorado Guard were their attorney, Campbell, and DeLue and Gilmore, and attending and representing the employees were Criswell, Bossen, Nesmith, and Reynolds. At the meeting, Criswell explained the steps that had been taken to form a union, and asserted that a unit composed of patrolmen and dispatchers would be appropriate. He also stated to counsel for Frontier Guard and Colorado Guard that he regarded the walkout as a strike; that if Frontier Guard and Colorado Guard would reinstate the strikers he would advise that they waive any possible back pay claim, and that reinstatement would be without any prejudice to any position Frontier Guard and Colorado Guard might wish to take with respect to the unit or recognition. DeLue and Gilmore agreed for their companies to take all the matters, including the request for reinstatement, under consideration. On the following day, Campbell, counsel for Frontier Guard and Colorado Guard, advised Criswell that his offer was unacceptable.
 
 
 33
 After the request for reinstatement was received on October 29, 1964, other persons were employed by Frontier Guard and Colorado Guard from time to time and worked for them or their successor, Patrol Services, for various lengths of time.[6]
 
 
 34
 The respondents concede that none of them ever offered reemployment to any of the strikers after receiving their request for reinstatement. DeLue and Gilmore asserted that they understood the request was conditional. It clearly was not.[7]
 
 
 35
 On November 12, 1964, Bossen, Nesmith and Reynolds, purporting to act as trustees for Merchant Police Employees Association, the newly formed union, addressed a letter to various customers of Frontier Guard and Colorado Guard, advising each of them of the strike and that they wished to explain the circumstances of the dispute. In the letter, they pointed out that the merger had resulted in changes in working conditions which the employees sought to take up with the respondents, but that the respondents had refused to "listen to their legitimate complaints," and the employees had thereafter walked out in protest. In the letter, they referred to an unconditional offer to return to work after the walkout and its rejection and said, "We do not know how these companies are presently rendering the service you need." They concluded the letter by advising that they had filed charges with the Board, that the wage rates were unreasonably low, and urging the customers addressed to cease using the services of the respondents.
 
 
 36
 After the strike, three of the strikers, Moffett, Vourexes and Smith, formed a competing firm in the patrol business, known as American Patrol, by which they were employed. In some instances, they solicited former customers of Frontier Guard and Colorado Guard for American Patrol.
 
 
 37
 The Trial Examiner found the evidentiary facts substantially as we have stated them and from them made the following ultimate findings and conclusions:
 
 
 38
 At all times here material, Frontier Guard was engaged in a business which affects commerce within the meaning of § 2(6) and (7) of the Act.
 
 
 39
 Frontier Guard and Colorado Guard were not a single integrated enterprise prior to the date of the pre-incorporation agreement. Common ownership and control and physical and functional integration were absent prior to that date.
 
 
 40
 Prior to November 12, 1964, Frontier Guard and Colorado Guard did not constitute a joint employer engaged in commerce within the meaning of § 2(2), (6) and (7) of the Act.
 
 
 41
 Separate business enterprises having some business relationship may act in concert to accomplish a specific purpose or end with relation to their employees and if they do so to the extent their joint conduct is unlawful, joint liability attaches to them, even though there would be no joint liability if they had acted separately.
 
 
 42
 During the last two weeks of October 1964, DeLue and Gilmore were engaged in exploring the desirability of merging their patrol and guard operations, and to a certain extent, the burglar alarm business of Colorado Guard.
 
 
 43
 Because of their joint interest in the merger, and their desire to present a united front to their employees with respect to labor controversies and further their common interests with respect to labor relations, Frontier Guard and Colorado Guard from October 27 to November 12, 1964, jointly pursued a common labor policy, and acted jointly in all their dealings with their employees with respect to labor relations, including denying for the same stated reason their employees' unconditional request for reinstatement; and by joint and concerted action, they committed unfair labor practices.
 
 
 44
 Since the jurisdiction of the Board over Frontier Guard was established and conceded by the respondents, Colorado Guard, by such joint action with Frontier Guard, was responsible for their unlawful joint conduct, and the Board also had jurisdiction to require Colorado Guard to remedy it.
 
 
 45
 Patrol Services was the successor to Frontier Guard and Colorado Guard. By the execution of the pre-incorporation agreement on November 12, 1964, Frontier Guard and Colorado Guard evidenced their intention to continue the operation of their respective businesses as one. From that date, the elements of common ownership and control, functional and physical integration, and common labor relations were all present in sufficient measure to justify the conclusion that Frontier Guard, Colorado Guard and Patrol Services constituted a single integrated enterprise, which was engaged in carrying on a business that affected commerce within the meaning of § 2(7) of the Act.
 
 
 46
 At all times here material, Allen and Anderson were supervisory employees of Frontier Guard, and Condos was a supervisory employee of Colorado Guard.
 
 
 47
 The employees of Frontier Guard and Colorado Guard who attended the meeting with DeLue on October 27, 1964, came to the meeting anticipating only a preliminary discussion and without a preconceived plan or intent to strike if their demands were not met.
 
 
 48
 DeLue made no threats at the meeting, which were calculated to interfere or which did interfere with the rights of Frontier Guard's or Colorado Guard's employees under the Act. The walkout or strike which followed the meeting was a spontaneous reaction of the employees to DeLue's refusal to discuss their demands more fully and was not to protest unfair labor practices. The reasons for the strike were economic in nature and the strike protected employee activity.
 
 
 49
 DeLue did not discharge the employees who engaged in the strike. On October 29, 1964, the employees who walked out on October 27, 1964, made an unconditional request for reinstatement. The strike ended when Frontier Guard and Colorado Guard received the request for reinstatement. Frontier Guard and Colorado Guard had the right to hire replacements while the strike was in effect, and when it ended they were not required to displace employees so hired. But as and when jobs became available after the strike had ended, they were required to offer them to employees who had requested reinstatement,[8] unless they had good reason for not doing so, unrelated to employee participation in the strike.
 
 
 50
 The employees who requested reinstatement were entitled to be reinstated to available jobs, according to the respondents' existing seniority rules or upon some other nondiscriminatory basis. The employees who requested reinstatement did not forfeit their rights thereto by reason of the union's letter of November 12, 1964, to customers of Frontier Guard and Colorado Guard.[9]
 
 
 51
 Moffett, Vourexes and Smith, by forming and operating a competing firm in the patrol business and by soliciting former customers of Frontier Guard and Colorado Guard, were not guilty of an act of disloyalty which forfeited their rights to reinstatement.[10]
 
 
 52
 The respondents, in violation of § 8(a) (3) of the Act, discriminatorily refused to offer jobs, as and when they became available after the strike had ended, to the employees who had requested reinstatement.
 
 
 53
 By interfering with, restraining, and coercing their employees in the rights guaranteed them by § 7 of the Act, respondents engaged in unfair labor practices within the meaning of § 8(a) (1) of the Act, which affected commerce within the meaning of § 2(6) and (7) of the Act.
 
 
 54
 After a careful examination of the record as a whole, we are of the opinion that the findings of fact of the Trial Examiner, adopted by the Board, are supported by substantial evidence.
 
 
 55
 As to some of the issues, there was evidence tending to support contrary findings from those made by the Trial Examiner, but in our opinion other evidence in the record and the inferences reasonably deductible therefrom afforded ample support of a substantial nature for the findings made by the Trial Examiner.
 
 
 56
 The relationship between Frontier Guard and Colorado Guard during the period from October 27 to November 12, 1964, presents a most difficult question, with respect to the Board's jurisdiction over Colorado Guard.
 
 
 57
 The Board is empowered, as provided in the Act, to prevent any person from engaging in unfair labor practices affecting commerce (29 U.S.C.A. § 158).
 
 
 58
 The term "affecting commerce" is defined in 29 U.S.C.A. § 152(7) as follows:
 
 
 59
 "The term `affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."
 
 
 60
 When two employers, one of whom is engaged in a business that affects commerce, and the other in a business, which if operated by him alone and separately from the other employer would not affect commerce, operate their businesses under common ownership and control and functional and physical integration substantially as one, and in so operating their businesses they engage jointly and in concert in unfair labor practice or practices, as defined in § 8 of the Act (29 U.S.C.A. § 158), to achieve a common purpose in their labor relations, the Board acquires jurisdiction over both employers to afford a remedy for such practice or practices and prevent them in the future.
 
 
 61
 We think the same result follows where such employers jointly employ their labor force, which serves and functions as a unit for both employers.
 
 
 62
 With respect to acts that took place up to November 12, 1964, the instant case does not fall in either category, and we have not found and counsel have not cited any case dealing with facts and circumstances like those here presented.
 
 
 63
 However, Frontier Guard and Colorado Guard were engaged in the same type of business. For some time prior to October 27, 1964, they had engaged in transactions with respect to the operation of their businesses believed to be mutually beneficial. During the period of at least two weeks prior to November 12, 1964, they were seriously considering the merger of their businesses. Their employees had been advised of the proposed merger. From the date the strike occurred, Frontier Guard and Colorado Guard acted in furtherance of their common interest in the merger. DeLue aided Condos in replacing Colorado Guard's employees who had walked out. After the walkout, Frontier Guard and Colorado Guard employed the same lawyer to represent them in labor matters. Together, they met with their employees and the latter's lawyer on November 2, 1964. They agreed to consider a request for reinstatement and other matters presented to them at the meeting. They sent a single reply, in which both joined, on November 3, 1964, in which they rejected the request for reinstatement for the same stated reason. They engaged as one in unfair labor practices which affected commerce. In short, they engaged in unitary action to serve what they apparently believed would promote their common interests in their relationships with their employees, and dealt with their employees as a single unitary group.
 
 
 64
 We believe that in refusing to reinstate the employees who had requested reinstatement, as and when positions were available from the time the strike ended, Frontier Guard and Colorado Guard engaged in unfair labor practices which affected commerce, which could only be effectually and fully remedied by the Board exercising jurisdiction over Frontier Guard and Colorado Guard with respect to their unfair labor practices between October 27 and November 12, 1964.
 
 
 65
 We further believe that from and after November 12, 1964, through the common ownership and control of Frontier Guard, Colorado Guard, DeLue and Gilmore, and through functional and physical integration of the business operations theretofore carried on by Frontier Guard and Colorado Guard, in Frontier Guard and Patrol Services there came into being an integrated enterprise of Patrol Services, Frontier Guard, and Colorado Guard.
 
 
 66
 Counsel for the respondents contend, however, that Colorado Guard never became a part of such single integrated enterprise, which was engaged in carrying on a business that affected commerce within the meaning of § 2(7) of the Act. Assuming, but not deciding, that Colorado Guard did not become a part of such enterprise, we think the same result would follow, for the reasons we shall now undertake to state.
 
 
 67
 Prior to November 12, 1964, Colorado Guard had become obligated, as and when jobs became available, to offer them to its employees who had requested reinstatement. On or very shortly after November 12, 1964, Colorado Guard transferred its patrol business, the equipment used to carry on its patrols, and other assets to Patrol Services, and the latter took over such patrol business, equipment, and other assets, and the employees who had been serving Colorado Guard, and together with Frontier Guard operated the businesses theretofore carried on by Colorado Guard and Frontier Guard as a single integrated enterprise. Thereafter, Colorado Guard's sole assets, so far as this record shows, were a very substantial amount of capital stock in Patrol Services. When Colorado Guard, itself, ceased to operate the patrol business theretofore carried on by it and turned its work force over to Patrol Services and Frontier Guard, it disabled itself from carrying out its obligation to offer jobs, as and when they became available, to its former employees who had requested reinstatement. We think, thereupon, such obligation devolved upon Patrol Services and Frontier Guard. Otherwise, an employer could avoid its obligation to offer reemployment to its former employees by the simple expedient of forming a new corporation and turning its business assets, the operation of its business, and its work force over to the new corporation, although through stock interests it retained a large degree of control over the new corporation. The control of Patrol Services, after its formation, rested equally in Colorado Guard and Gilmore, and Frontier Guard and DeLue, through majority stock interests.
 
 
 68
 Hence, we conclude that from November 12, 1964, Patrol Services was obligated to carry out all appropriate orders of the Board to remedy the unfair labor practices committed by Frontier Guard and Colorado Guard prior to November 12, 1964, and after that date continued by Patrol Services, by not offering jobs to their employees who requested reinstatement as and when jobs became available.[11]
 
 
 69
 For the reasons stated by the Trial Examiner, we conclude that the rights of the employees to reinstatement were not forfeited by the union's letter of November 12, 1964, and the operation by three of such employees of a competing patrol business.
 
 
 70
 The order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 Hereinafter called the Board
 
 
 [2]
 Hereinafter called Frontier Guard
 
 
 [3]
 Hereinafter called Colorado Guard
 
 
 [4]
 Hereinafter called Patrol Services
 
 
 [5]
 Englewood is a suburb of Denver
 
 
 [6]
 On October 27 or 28, 1964, Frontier Guard hired Gardner Sanford, Win Ingmire, Arthur Randolph and Harold T. Francis as patrolmen. Randolph worked continuously thereafter in such capacity until February 22, 1965, when his employment terminated. At the time of the hearing, the others were still working for Patrol Services, the successor to Frontier Guard in its patrol operation. Ingmire was hired and continued to work as a supervisor, replacing Anderson. John Wilkin and Katherine Greenwell were hired as dispatchers and were still employed by Frontier Guard at the time of the hearing
 On October 27 or 28, 1964, Colorado Guard hired Harry Butler, Clay Tarplay, Ray Nelson and Louis Godby as patrolmen. Nelson quit on November 7, 1964, but at the time of the hearing the others were still employed as patrolmen by Patrol Services.
 It was stipulated that between November 1, 1964, and the end of the year, persons were hired as patrolmen or dispatchers on the dates and for the periods following:
 Darrell Brink, patrolman, November 2 to date of hearing; Kenneth Linz, dispatcher, November 19 to November 19; Lee Voss, dispatcher, November 5 to November 25; Archie Alexander, patrolman, November 3 to November 3; Robert Bailey, patrolman, November 9 to date of hearing; Lawrence Kent, patrolman, November 6 to December 6; Gary Keys, patrolman, November 9 to January 25, 1965; Richard G. Lee, patrolman, November 7 to November 22; Harold Mattingly, patrolman, November 5 to November 6; James McNamara, patrolman, November 28 to February 1965; Robert Sharp, patrolman, November 9 to November 12; Dwight Sutter, patrolman, November 18 to November 24; Carl Van Horn, patrolman, November 1 to date of hearing; Robert Weathering, patrolman, November 3 to date of hearing.
 It was also stipulated that each of the names listed appeared on the payroll of Patrol Services, except for the two dispatchers who were on the payroll of Frontier Guard. Although Patrol Services did not come into being until November 12, 1964, the transfer of patrolmen from Frontier Guard and Colorado Guard was made retroactive to November 1, 1964, by the terms of the pre-incorporation agreement. The record does not show which of the persons named immediately above, hired prior to November 12, 1964, were hired by Frontier Guard and which were hired by Colorado Guard.
 
 
 [7]
 Both DeLue and Gilmore relied on the motel agreement signed immediately after the walkout as controlling the position of the strikers with respect to returning to work. Knowledge of that agreement came to them indirectly, through Supervisor Condos, who had asked a striker to return on the very night of the walkout and had been told of the agreement. The next day, however, the employees consulted Criswell and acted on his advice in signing the request for reinstatement. It clearly was a repudiation of their previous agreement, and both Frontier Guard and Colorado Guard knew that it was later in point of time than the motel agreement. At the meeting on October 30, when the request was again renewed orally by Criswell, neither DeLue nor Gilmore asked any questions with respect to any conditions attached to the request
 
 
 [8]
 We exclude from the word "employees," supervisory employees in the phrase "employees who had requested reinstatement" and in like phrases, infra, in this opinion
 
 
 [9]
 The Trial Examiner found that the letter of November 12, 1964, was addressed to present customers of Frontier Guard and Colorado Guard and not to the general public; that it did not directly disparage the quality of the services being rendered by Frontier Guard and Colorado Guard, and that at most it was a querulous opinion addressed to customers of Frontier Guard and Colorado Guard, who had been receiving their services both before and after the strike and were in a good position to evaluate their quality
 
 
 [10]
 The Trial Examiner concluded that the three former employees, by engaging in a type of work for which they were qualified, after Frontier Guard and Colorado Guard had placed them in a position where they were required to work elsewhere by refusing to reinstate them, did not forfeit their rights to reemployment
 
 
 [11]
 See United States Pipe and Foundry Co. v. NLRB, 5 Cir., (decided July 23, 1968, 398 F.2d 544; Cf. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-551, 84 S.Ct. 909, 11 L.Ed.2d 898. The facts in the instant case clearly distinguish it from NLRB v. Birdsall-Stockdale Motor Co., 10 Cir., 208 F.2d 234