**CROSS–SOUND FERRY SERVICES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Viking Starship, Inc., Intervenor.**

**Nos. 88–1455, 88–1456.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1989.

Decided April 28, 1989.

---

Eugene D. Gulland, with whom Richard G. Slattery, Washington, D.C., was on the brief, for petitioner.

Craig M. Keats, Deputy Associate Gen. Counsel, I.C.C., with whom Charles F. Rule, Asst. Atty. Gen., Robert S. Burk, Gen. Counsel, I.C.C., Dennis J. Starks, Atty., I.C.C., and Catherine G. O'Sullivan and David Seidman, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents.

Edward D. Greenberg and Mark T. Priesing, Washington, D.C., were on the brief, for intervenor.

Before MIKVA, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This petition for review concerns a decision by the Interstate Commerce Commission ("ICC" or "Commission") that certain water carriage services provided by Viking Starship, Inc. ("Viking") were ferry services exempt from ICC regulation by statute, 49 U.S.C. § 10544(a)(4). *See Viking Starship, Inc.—Common Carrier Application (Montauk, NY)*, 4 I.C.C.2d 634 (1988) (*"Viking Starship"*). One of Viking's competitors, Cross–Sound Ferry Services, Inc. ("Cross–Sound"), challenges both the exemption granted by the ICC to Viking and earlier Commission decisions finding Viking fit and authorizing temporary operations. We hold that the Commission failed to explain adequately its change in policy with respect to the ferry exemption, and we remand for a fuller exegesis of the Commission's views. We find, however, that the Commission's grant of temporary operating authority to Viking was lawful and premised on an adequate record, so that Viking may continue to provide service while the Commission revisits this proceeding.

I.

The ICC, in a series of unpublished decisions in 1987 and early 1988, granted Viking emergency temporary authority ("ETA") and later temporary authority ("TA") to provide water carrier operations transporting passengers and their baggage between: (1) Montauk, New York, and Block Island, Rhode Island; and (2) Montauk and a point between Groton and New London, Connecticut ("Groton/New London"). *See* 49 U.S.C. § 10928(a); 49 C.F.R. §§ 1162, 1163 (1987) (providing the basis of authority to grant ETA and TA). In this appeal, Cross–Sound contests Viking's service only between Montauk and Groton/New London. In the ETA and TA proceedings, Cross–Sound had protested the grant of operating authority to Viking, principally on three grounds: (1) there was no public need for Viking's operations, as required by 49 U.S.C. § 10922(a)(2); (2) Viking was "unfit" within the meaning of 49 U.S.C. § 10922(a)(1), because it had provided service for several years without applying to the ICC for required operating authority; and (3) Viking was "unfit" because it was using docking facilities in violation of Groton zoning ordinances.

The Commission, however, rejected these objections in granting Viking ETA and TA. It first found that Viking had shown sufficient need for its services. Viking had submitted statements from numerous businessmen who confirmed that many of their

customers relied on Viking's services. The Commission noted that it previously had recognized the difficulties in obtaining testimony from individuals, especially tourists, and often had relied on declarations from travel agents and other businessmen who had actual knowledge of the need for passenger transportation. In addition, the ICC dismissed Cross–Sound's suggestion that its route between New London, Connecticut, and Orient Point, New York, some 75 miles from Montauk, eliminated the need for Viking's service.

The Commission next rejected Cross–Sound's suggestion that Viking was unfit because it had conducted water carrier operations without ICC approval for several years. Viking admitted that it previously had operated without an ICC certificate, but maintained that it had believed that its service was a ferry exempt from Commission regulation under 49 U.S.C. § 10544(a)(4), and in support of its position cited *North Rip Fish Harvest, Ltd.*, No. W–1325 (May 13, 1980) (*"North Rip"*) (finding transportation of passengers between Montauk and Block Island to be exempt ferry service). The Commission accepted this explanation and noted that Viking had cooperated with the ICC's Office of Compliance and Consumer Assistance when a question arose as to Viking's operating authority.

The Commission also found that a zoning dispute between the City of Groton and the owner of the docks used by Viking on a rental basis did not impugn Viking's fitness. The owner, Mr. Frank Scheetz, allegedly delayed in informing Viking that the city had ordered it to stop using the docks. There was every indication, however, that when Mr. Scheetz finally told Viking to cease, the company complied with the order. The ICC concluded that Viking was at most an interested third party to the dispute and had not committed any wrongdoing.

In addition, the Commission rejected Cross–Sound's argument that Viking's ETA and TA applications should be denied because Groton's zoning laws rendered it "unable" to offer Montauk–Groton/New London service, *see* 49 U.S.C. § 10922(a)(1). The ICC found that the ruling against Mr. Scheetz precluded Viking's service only temporarily because Mr. Scheetz might eventually be able to obtain zoning permission for Viking's use of his docks, and because Viking might be able to find alternate docking facilities. The Commission concluded that Viking was fit, willing, and able to provide Montauk–Groton/New London service, and it granted emergency, and later temporary, operating authority.

Viking then sought a permanent certificate to operate as a water carrier transporting passengers and their baggage along both the Montauk–Groton/New London and the Montauk–Block Island routes. By a decision dated June 1, 1988, the ICC found that the proposed service was a ferry service under 49 U.S.C. § 10544(a)(4), *see Viking Starship*, 4 I.C.C.2d at 635. Ferry operations are exempt from ICC jurisdiction except to the extent that the Commission finds regulation necessary to carry out the national transportation policy of 49 U.S.C. § 10101. The Commission rejected Cross–Sound's arguments that the operations were not ferriage because the distances between the points involved (30 miles for Groton/New London and 15 miles for Block Island) were too great; the routings, although direct, involved nominally different bodies of water (the Long Island and Block Island Sounds); and the seasonal nature of the service, twice-daily during the summer, was not frequent or regular enough. The Commission found that "the involved route is simply a substitute for a bridge between Montauk and the Connecticut mainland, and, thus, within the scope of the ferry exemption." *Viking Starship*, 4 I.C.C.2d at 637. The Commission then analyzed the requirements of national transportation policy and concluded that "[b]y delaying [Viking's] entry into this local market we would only harm the affected public," 4 I.C.C.2d at 638, because there was a clearly demonstrated need for Viking's services.

Cross–Sound petitions for review of the ICC's decisions both to exempt Viking's operations as a ferry service, and to grant Viking ETA and TA. Cross–Sound argues

that the Commission misconstrued the ferry exemption; that it erred in denying Cross–Sound an opportunity for additional discovery and a hearing; that its decision to apply the ferry exemption violated the Coastal Zone Management Act, 16 U.S.C. § 1456, and the National Environmental Policy Act, 42 U.S.C. § 4332; and that it failed to consider relevant evidence and statutory requirements in granting Viking ETA and TA.

## II.

### A.

We first examine the Commission's decision that Viking's service between Montauk and Groton/New London constituted "ferry" service exempt from ICC regulation under the Interstate Commerce Act, 49 U.S.C. § 10544(a)(4). The statute does not define the term "ferry," and there is no legislative history on the point, so that this case is governed by the familiar "second prong" of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because "the statute is silent or ambiguous with respect to the specific issue," the question is whether the Commission's interpretation is a "reasonable" one, *Chevron,* 467 U.S. at 843, 845, 104 S.Ct. at 2782, 2783, i.e., one that is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *see also Mobil Oil Corp. v. EPA,* 871 F.2d 149, 151–152 (D.C.Cir.1989) (*per curiam* ).

The Commission has great latitude in determining the scope of the ferry exemption and in modifying it from time to time as the Commission sees fit. *See Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."); *see also General American Transportation Corp. v. ICC,* 872 F.2d 1048, 1053–1054 (D.C.Cir.1989). The Com-

mission may also announce changes in the construction of its enabling statute on a case-by-case basis through adjudications, *see ANR Pipeline Co. v. FERC,* 870 F.2d 717, 722 (D.C.Cir.1989). This, of course, does not mean that the ICC may "casually ignore its own past decisions"; it is well known that "[d]ivergence from agency precedent demands an explanation." *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C.Cir. 1989); *see also United Food & Commercial Workers Union,* 108 S.Ct. at 421 n. 20; *Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

We find in this case that the Commission has changed its view of the ferry exemption without explaining what its new interpretation is, and we conclude that this is not a permissible exercise of the Commission's power under *Chevron.* For over 40 years, the Commission has exercised regulatory authority over water carrier operations in the Long Island Sound. The Commission has traditionally described "ferries" as providing "transportation for a short distance, almost invariably between two points only, and unrelated to other transportation." *Ann Arbor Railroad Co.—Common Carrier Application,* 250 I.C. C. 490, 491 (1942) (quoting *Port Richmond and Bergen Point Ferry Co. v. Board of Chosen Freeholders of Hudson County,* 234 U.S. 317, 332, 34 S.Ct. 821, 826, 58 L.Ed. 1330 (1914)); *see also Peninsula Truck Lines, Inc. v. Puget Sound Navigation Co.,* 292 I.C.C. 157, 161 (1954) ("The term 'ferry' implies transportation for a short distance and unrelated to other transportation."); *Application of Part III to Transportation by Delaware–New Jersey Ferry Co.,* 265 I.C.C. 337, 344 (1948) (ferries provide "local short-distance transportation"). In the not too distant past, in fact, the ICC has asserted jurisdiction over point-to-point, regularly scheduled operations over routes shorter than—and in one case identical to—Viking's Montauk–Groton/New London route. *See Mascony Transport and Ferry Service, Inc., Initial Operations,* 353 I.C.C. 60 (1976), *aff'd,* 573

F.2d 725 (2d Cir.1978) (New London, CT to Greenport, NY); *Cross–Sound Ferry Services, Inc., Extension—Montauk, NY*, ICC Docket W–1290 (Sub–No. 4) (Sept. 23, 1983) (New London, CT to Montauk, NY); *Shoreline Boating Service, Inc.*, ICC Docket No. W–1294 (May 29, 1984) (Norwalk, CT to Northport, NY); *B.I. Marine Express, Inc.*, ICC Docket No. W–1450 (Sub–No. 1TA) (Oct. 14, 1986), *petition for review dismissed*, No. 86–1711 (D.C.Cir.1987) (Westerly, RI to Block Island, RI). The discrepancy between these cases and the Commission's decision before us is *prima facie* evidence of a change in ICC policy.

The Commission admitted as much in its opinion below. It stated:

> We must also evaluate the meaning of the term "ferry" in light of contemporary transportation practices and regulatory policy. As transportation needs and technology have changed over the years, so too has the concept of ferry service. Although a ferry service will still generally connect highways on opposite sides of a body of water, the length of the crossing is likely to be longer. This is due, in part, to increasing urban and ex-urban traffic congestion and the resulting need for alternative forms of transportation. Consequently, we are inclined to interpret the ferry exemption in an expansive manner consistent with contemporary transportation needs.

*Viking Starship*, 4 I.C.C.2d at 636 (footnote omitted). The Commission later described its decision in *Viking Starship* as "evaluat[ing] the ferry service exemption * * * in light of contemporary transportation practices and regulatory policy." *The Bridgeport and Port Jefferson Steamboat Co., Extension—Connecticut and New York Points*, No. W–271 (Sub–No. 4) (Dec. 16, 1988), at 2.

We have no reason to cabin the Commission's intention to interpret the ferry exemption in an "expansive manner." However, the Commission must explain its new view of the exemption and describe how it arrived at its new view; that is the essence of reasoned decision-making. In its opinion

the Commission stated that ferries share the following characteristics:

> (1) ferries operate in rivers, lakes, bays, and sounds, as opposed to oceans or along the coast;
>
> (2) ferries provide for passengers or vehicles, or both;
>
> (3) they operate over the most direct water route between two points; and
>
> (4) they provide a service normally attributed to a bridge or tunnel.

*Viking Starship*, 4 I.C.C.2d at 636.

This mechanical definition left several important questions unaddressed. The Commission, for example, did not explain what significance, if any, attaches to the *length* of a carrier's route. The Commission's opinion below cited *Michigan–Wisconsin Transportation Co.*, No. W–1377 (Sub–No. 4–1TA) (May 15, 1984) (*"Michigan–Wisconsin"*), which concluded that "the term 'ferry service' must be *redefined* to reflect statutory intent in light of * * * changed circumstances," *id.* at 1 (emphasis added), and found that a 100–mile route across Lake Michigan could qualify as a ferry. *Compare Ann Arbor Railroad Co. —Common Carrier Application*, 250 I.C. C. 490, 492 (1942) (rejecting routes of 60, 79, 80, and 100 miles as too long to qualify for ferry service). In *Michigan–Wisconsin*, the Commission declared that it had abandoned its prior view that distance was an important actor in determining ferry service, *see id.* at 2 ("To the extent this decision conflicts with previous Commission decisions defining a ferry service, those previous decisions are expressly overruled."). We cannot say whether the Commission still endorses the view it expressed in *Michigan–Wisconsin*, or whether it has retreated to a less extreme position, *see Viking Starship*, 4 I.C.C.2d at 636 n. 2 ("in a modern day context, what is properly deemed a local service ought to be interpreted in a more expansive manner considering the larger, more sprawling nature of contemporary metropolitan areas and their resulting traffic patterns"). If the Commission has abandoned *Michigan–Wisconsin* and adopted some intermediate stance,

we do not know what the details of that stance are.

We also note that the Commission in its decision below omitted reference to frequency of service as an important criterion. Again, we are uncertain what role this factor now plays in the Commission's calculations. *Compare* 49 C.F.R. § 171.8 (1988) (Department of Transportation regulations defining "ferry vessel" as, in part, "operat[ing] on a short run on a frequent schedule between two points").

In addition, we are puzzled by the Commission's statement that a ferry may only travel "the most direct water route" between two points. At oral argument, counsel for the Commission emphasized that the route between Montauk and Groton/New London was a "straight shot," as if to say that a path with an angle or arc would disqualify a carrier otherwise deserving a ferry status. If the Commission means that a ferry must use the most direct *practicable* route between two points, or that it cannot transform its route into a sightseeing cruise by making detours on its way to a final destination, then the Commission should say so. Otherwise, we cannot conceive why a ferry must necessarily travel a straight line, oblivious to currents, underwater hazards, and navigational realities.

Finally, the Commission must further explain its idea that a ferry is a "substitute for a bridge," and explore fully the implications of the bridge analogy. Prior cases used the "bridge" test as a *limit* on what constituted a ferry, by requiring that the service provided remain essentially local in character. *See, e.g., Ann Arbor Railroad Co.—Common Carrier Application,* 250 I.C.C. 490, 491 (1942). The Commission's decision in the case *sub judice* seems to depart from this approach. It implies that direct service along *any* route shorter than 26 miles would qualify as a "ferry" because it would be within the limit of "existing bridge and tunnel building technology." *Viking Starship,* 4 I.C.C.2d at 637. The Commission expressly found that Viking's route "is simply a substitute for a bridge between Montauk and the Connecticut mainland," 4 I.C.C.2d at 637, even though it

acknowledged that such a bridge had never been seriously contemplated for economic reasons. We doubt that the Commission intends to link its definition of "ferry" strictly to the technological limits of tunnel and bridge construction; the *Queen Elizabeth II* is surely not a ferry, even if a showing could be made that a trans-Atlantic tunnel, though astronomically expensive, would be technologically "feasible" in the narrowest of senses, given the necessary investment of resources. But based on the decision below, we cannot discern the precise relationship the Commission sees between the limits of bridge and tunnel technology, and what constitutes a "ferry."

In sum, because we are not sure what the ICC's new view of the ferry exemption *is*, we cannot uphold its decision. As we have recently opined in a related context, "[w]e cannot defer to what we cannot perceive." *International Longshoremen's Association v. National Mediation Board,* 870 F.2d 733, 736 (D.C.Cir. 1989). "The basis for an administrative decision, of course, must be clear enough to permit effective judicial review. 'It will not do for a court to be compelled to guess at the theory underlying the agency's action.'" *Id.* (quoting *Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947)).

We have identified some of the ambiguities latent in the Commission's current application of the ferry exemption. The Commission is free on remand to consider these, as well as any other issues surrounding the ferry exemption, and to adopt any permissible construction, so long as it clearly enunciates its definition of a "ferry" and the reasons for its reinterpretation. Because we are remanding the case to the Commission, we need not decide whether the ICC's action in this case violated the Coastal Zone Management Act or the National Environmental Policy Act (and whether petitioner had standing to raise those issues). Similarly, we do not address Cross–Sound's argument that the ICC erred in not permitting additional discovery

or granting a hearing, because we cannot review the Commission's determination that neither discovery nor a hearing "would * * * generate any additional facts that would change our legal conclusions," *Viking Starship,* 4 I.C.C.2d at 639 n. 8, without knowing the precise scope of the ferry exemption. The Commission may find it useful on remand to use a hearing as a vehicle to re-examine and articulate its new view of the ferry exemption.

### B.

■ We turn next to the merits of the Commission's ETA and TA decisions. Because we hold that these decisions were proper, Viking may continue to operate while the Commission reviews the definition of "ferry" that it used in *Viking Starship.*

Decisions of the ICC may be reversed only if they are arbitrary and capricious or unsupported by substantial evidence, *see Cross–Sound Ferry Services, Inc. v. ICC,* 738 F.2d 481, 484 (D.C.Cir.1984). Many of the arguments made by Cross–Sound challenging the grant of ETA and TA to Viking were raised before the Commission below and rejected. We find no basis to upset the Commission's determinations that there was sufficient need for Viking's services; that the Groton zoning dispute did not impugn Viking's fitness; and that Viking did not act improperly in operating without a certificate because it believed that it was exempt from regulation under *North Rip* and because it cooperated with the Commission enforcement staff.

On appeal, Cross–Sound has refined its objections. It now contends that the Commission failed to apply the correct standard of "fitness" in making the ETA and TA decisions, because it overlooked evidence that Viking defied two separate cease and desist orders and misrepresented material facts to the Commission. Cross–Sound alleges that even if Viking were reasonable in operating without a certificate, during August and September 1986 Viking ignored a letter from the Commission's Office of Compliance and Consumer Assistance, dated August 5, 1986, ordering Vi-

king to cease its Montauk–Groton/New London and its Montauk–Block Island routes. Viking, according to Cross–Sound, also operated in violation of a cease and desist order issued by the City of Groton on July 15, 1986 and upheld by the Groton Zoning Board of Appeals on August 26, 1986, that forbade the discharge of passengers at the city's docks. Viking, moreover, told the Commission on July 17, 1987, that its "past difficulties" with Groton had been "resolved" and that it had "discontinued its operations until the issue was resolved." This was not in fact true—Mr. Scheetz was later held in civil contempt by the New London Superior Court on August 17, 1987 because he "continue[d] to permit a ferry boat to dock at his property and continue[d] to allow the picking up and discharging of passengers from said ferry boat, without any approval by the Planning and Zoning Commission for said activity." *Scheetz v. City of Groton,* No. CV 86–0502034–S, slip op. at 3 (Conn.Super.Ct.1987).

These arguments, however, are insufficient to invalidate the Commission's decision. As an initial matter, we note that the ICC enjoys considerable discretion in deciding how it will administer its own regulations, *see Tallahassee Branch of the NAACP v. FCC,* 870 F.2d 704, 706, 710 (D.C.Cir.1989); *cf. Heckler v. Chaney,* 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). How the ICC chooses to enforce its own cease and desist orders, and how it responds to alleged misrepresentations in proceedings before it, are topics primarily for the Commission's considered judgment. In this case, the ICC found that after receiving the ICC's cease and desist order, Viking's attorney met with the Commission's Office of Compliance and Consumer Assistance to discuss the matter in light of the ICC's prior decision in *North Rip.* When the controversy was not resolved before the beginning of the next summer season, Viking filed for ETA and TA in order to ensure that its service was legal until the dispute over operating authority was settled. The Commission found that Viking made honest efforts to comply with the ICC's regulations

and did not attempt to evade the cease and desist order.

In addition, the Commission discounted the seriousness of the Groton zoning inquiry because it was a proceeding between the city and Mr. Scheetz, Viking's landlord, and did not directly implicate Viking itself. Mr. Scheetz, not Viking, was held in contempt by the New London Superior Court, and by all accounts, Viking stopped using the docks when Mr. Scheetz instructed it to do so.

We cannot say on the record before us that the Commission acted unreasonably in granting ETA and TA to Viking.

### III.

We remand the case to the Commission, so that it may further develop and articulate its interpretation of the ferry exemption, 49 U.S.C. § 10544(a)(4). We affirm the Commission's award of ETA and TA to Viking.

*It is so ordered.*